Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

_____ Division

Delsie E. Parker

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* ☐ Yes ☑ No

**Plaintiff(s)**
*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

**-v-**

Loyola University Maryland

**Defendant(s)**
*(Write the full name of each defendant who is being sued.  If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names.)*

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

**I.     The Parties to This Complaint**

    **A.     The Plaintiff(s)**

        Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Delsie E. Parker |
| Street Address | 125 Willow Bend Drive, Apt. 3C |
| City and County | Owings Mills |
| State and Zip Code | Maryland 21117 |
| Telephone Number | (410)302-5617 |
| E-mail Address | parker0504@gmail.com |

    **B.     The Defendant(s)**

        Provide the information below for each defendant named in the complaint, whether the defendant is an
individual, a government agency, an organization, or a corporation.  For an individual defendant,
include the person's job or title *(if known)*.  Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Defendant No. 1

    Name                             Loyola University Maryland

    Job or Title *(if known)*    C/O Terrence M. Sawyer - President

    Street Address                 4501 N. Charles Street

    City and County              Baltimore

    State and Zip Code         Maryland, 21210

    Telephone Number        (410) 617-2000

    E-mail Address *(if known)*

Defendant No. 2

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 3

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 4

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

### C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Loyola University Maryland |
| Street Address | 4501 N. Charles Street |
| City and County | Baltimore |
| State and Zip Code | Maryland, 21210 |
| Telephone Number | (410) 617-2000 |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Other federal law *(specify the federal law)*:

☐    Relevant state law *(specify, if known)*:

☐    Relevant city or county law *(specify, if known)*:

**III.    Statement of Claim**

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐    Failure to hire me.

☑    Termination of my employment.

☐    Failure to promote me.

☐    Failure to accommodate my disability.

☑    Unequal terms and conditions of my employment.

☑    Retaliation.

☐    Other acts *(specify)*: _____

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

See Attachment

C.    I believe that defendant(s) *(check one)*:

☐    is/are still committing these acts against me.

☑    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☑    race _____

☑    color _____

☑    gender/sex _____

☐    religion _____

☐    national origin _____

☐    age *(year of birth)* _____ *(only when asserting a claim of age discrimination.)*

☐    disability or perceived disability *(specify disability)*

_____

E.    The facts of my case are as follows.  Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

See Attachment

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.   Exhaustion of Federal Administrative Remedies

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

August 2017

B.   The Equal Employment Opportunity Commission *(check one)*:

☐   has not issued a Notice of Right to Sue letter.

☑   issued a Notice of Right to Sue letter, which I received on *(date)*   01/29/2020      .

*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.   Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐   60 days or more have elapsed.

☐   less than 60 days have elapsed.

## V.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

See Attachment

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        12/06/2021

Signature of Plaintiff

Printed Name of Plaintiff      Delsie E. Parker

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

The Plaintiff, Miss Delsie E. Parker, is a dark-skinned, African American Female.  The Plaintiff was employed with Loyola University Maryland from September 10, 2012 until February 25, 2019. At the time of filing this Complaint, the Plaintiff resides at 125 Willow Bend Drive, Apt. 3C, Owings Mills, Maryland 21117.

## WORK HISTORY WITH LOYOLA UNIVERSITY MARYLAND

1. **September 10, 2012**, the Plaintiff, Miss Delsie E. Parker, started her employment with Loyola University Maryland in Baltimore, (

2. **September 07, 2013**, the Plaintiff was pro Investigator for Loyola University Marylar

3. **July 11, 2015**, the Plaintiff's position as "/ "Investigator."

4. **February 25, 2019**, the Plaintiff was term Loyola University Maryland.

### CO

The Plaintiff alleges that she was subject to a h Race, and Sex.  And, in retaliation to the Plaintiff's filing complaints with Loyola University Maryland Human Resources Representatives and, with the U.S. Equal Employment Opportunity Commission (EEOC); for Loyola University Maryland being in violation of Title VII and the Equal Pay Act (EPA); the Plaintiff believes that expressing her concerns to management and HR directly led to her receiving a lowered performance evaluations, a heavier workload than her peer, unequal and unfair pay, and, other forms of retaliation.  The Plaintiff also believes that

The Plaintiff, Miss Delsie E. Parker, is a dark-skinned, African American Female.  The Plaintiff

was employed with Loyola University Maryland from September 10, 2012 until February 25,

2019. At the time of filing this Complaint, the Plaintiff resides at 125 Willow Bend Drive, Apt.

3C, Owings Mills, Maryland 21117.

## WORK HISTORY WITH LOYOLA UNIVERSITY MARYLAND

1.  **September 10, 2012**, the Plaintiff, Miss Delsie E. Parker, started her employment with
    Loyola University Maryland in Baltimore, City as a Campus Police Officer III.

2.  **September 07, 2013**, the Plaintiff was promoted to Assistant Investigator/Title IX
    Investigator for Loyola University Maryland.  The Plaintiff interviewed for the position.

3.  **July 11, 2015**, the Plaintiff's position as "Assistant Investigator" was reclassified to
    "Investigator."

4.  **February 25, 2019**, the Plaintiff was terminated from her position as "Investigator" at
    Loyola University Maryland.

## COMPLAINT

The Plaintiff alleges that she was subject to a hostile work environment based on her Color,

Race, and Sex.  And, in retaliation to the Plaintiff's filing complaints with Loyola University

Maryland Human Resources Representatives and, with the U.S. Equal Employment Opportunity

Commission (EEOC); for Loyola University Maryland being in violation of Title VII and the Equal

Pay Act (EPA); the Plaintiff believes that expressing her concerns to management and HR

directly led to her receiving a lowered performance evaluations, a heavier workload than her

peer, unequal and unfair pay, and, other forms of retaliation.  The Plaintiff also believes that

1

due to her making the following complaints to management, Human Resources and EEOC,
contributed to management creating a more stressful, retaliatory, and hostile work
environment for her and, subsequently terminating her from her position as an
Investigator/Title IX Investigator at Loyola University Maryland.

1.  **September 07, 2013**, the Plaintiff was promoted from a Campus Police Officer III to
    Assistant Investigator/Title IX Investigator for Loyola University Public Safety
    Department.  Almost immediately after the promotion, the Plaintiff began to experience
    settle hints of bias/harassment from Timothy Fox, a Caucasian male (Former Director of
    Campus Police).  The Plaintiff can list at least three to four instances where the bias
    statements towards the Plaintiff by Former Director Fox were delivered in a sarcastic,
    ambiguous and mocking tone; which made the Plaintiff questioned if Timothy Fox had a
    prejudice towards women and/or minorities.  The only times that the Plaintiff would
    experience such behavior from Timothy Fox was when she was the only person of color
    present during the bi-weekly Student Life meetings and during the weekly staff
    meetings.

2.  **October 06, 2013**, the Plaintiff was assigned her first Sexual Assault Investigation.  The
    Plaintiff conducted the investigation with Dave Tiscione, a Caucasian male (former
    Assistant Director of Student Life).

3.  **October 21, 2013**, Dave Tiscione and the Plaintiff conducted a follow-up interview with
    the complainant of the Sexual Assault.  Also present during the interview was;
    Alexis Phelps, an African American, female, (Assistant Director of Student Life/Acting
    Advisor).

2

During the follow-up interview, the Complainant of the reported Sexual Assault stated that she sustained heavy bleeding from her vaginal area during the sexual assault. The complainant of the Sexual Assault also stated that there was blood all over the floor and rug in the dorm room where the alleged sexual assault took place. The Plaintiff, asked the Complainant of the Sexual Assault, if the blood was a result of her having a menstrual period or was it a result of her being a virgin or just being injured vaginally. The Plaintiff asked the question to determine if medical attention was needed; and to offer the complainant information regarding a sexual assault examination. The Plaintiff also needed to know if the rug was still in the dorm room where the sexual assault occurred; so that evidence from the crime scene could be collected.

4. **October 22, 2013**, Timothy Fox, came into the Plaintiff's office and met with her. Director Fox told the Plaintiff that she needed to start looking for another job. According to Director Fox, Christina Spearman, a Caucasian female (Former Director of Student Life/currently Dean of Students) was highly upset about the questions that the Plaintiff asked the Complainant of the Sexual Assault during the follow-up interview.

5. **October 23, 2013**, the Plaintiff was summoned by Timothy Fox, to report to Terrance Sawyer's office, a Caucasian male (Former Vice President of Student Conduct and Public Safety) for a meeting. Present during the meeting, along with Terrance Sawyer and the Plaintiff were:

      A. Joan Flynn, a Caucasian female (Assistant Vice President of Student Conduct)

      B. Director Timothy Fox, a Caucasian male (Former Director of Public Safety)

      C. Sean Kapfhammer, a Caucasian male (Former Asst. Director of Public Safety)

D. and Robert Maglia, a Caucasian male (Former Supervisor/Senior Investigator) From the beginning of the meeting, to almost the end of the meeting; the tone of the meeting was to terminate the Plaintiff.  The Plaintiff was asked to explain to Mr. Sawyer her logic and reasoning for asking the Complainant of the Sexual Assault the question where did the blood come from during the sexual assault.  Once the Plaintiff explained the reason that she asked the question was to determine if there was any physical evidence left at the scene of the crime, and to determine if the complainant/victim needed any medical attention so that a Sexual Assault Forensic examination could be conducted; Mr. Sawyer stated, "You changed my mind, now I understand why you asked the question."  Mr. Sawyer then told the Plaintiff that she could return to her office and go back to work.  Timothy Fox, Robert Maglia and the Plaintiff left Mr. Sawyer's office at the same time.  Timothy Fox appeared to be very angry towards the Plaintiff after they all left the meeting.  After Timothy Fox, Robert Maglia and the Plaintiff exited Mr. Sawyer's office, Timothy Fox turned to the Plaintiff and said, "You did well in there.  You saved yourself."  Timothy Fox then said, he wanted to meet with the Plaintiff and Robert Maglia in his office immediately upon returning to the Campus Police Building (5104 York Rd.).

When Timothy Fox, Robert Maglia and the Plaintiff returned to the Campus Police Building, Robert Maglia and the Plaintiff entered the office that they shared.  The Plaintiff then asked Robert Maglia if Director Fox still wanted to meet with her in his office.  At that time, Robert Maglia told the Plaintiff the Director Fox said, he did not

4

need to meet with the Plaintiff.  Robert Maglia also told the Plaintiff the Director Fox

stated with anger to him, "Look what I got stuck with.  I got stuck with a Delsie!"

Shortly thereafter, Timothy Fox entered the Plaintiff's office and immediately

approached the Plaintiff.  Director Fox instructed the Plaintiff to follow him.  The

Plaintiff followed Director Fox to a second Evidence Room.  Director Fox appeared to be

extremely angry as he mumbled words under his breath, as he led the Plaintiff to the

Evidence Room.  Once inside the Evidence Room, Director Fox turned to the Plaintiff

and said, "See this room, I want it cleaned out.  I want all these old folders from years

ago thrown out.  I want all the old cases and current year case folders to be placed in

order in the file cabinets."  Director Fox then used a key to open a safe that was inside

the evidence room.  Director Fox then said to the Plaintiff, "You see all this money in this

safe, this is money that we've taken from students over the years; also found money.  I

want you to count all the money that's in this safe."  Director Fox's reaction and actions

after he and the Plaintiff met with Terrance Sawyer were the beginning of him creating

an unequitable, unfair and hostile work environment for the Plaintiff.  Director Fox

created and fostered an atmosphere in the Investigators' Office that Robert Maglia's

only function of each day was to show up for work; and, go out to lunch with him.  All of

the day to day responsibilities of maintaining and running the Investigators' Office was

the Plaintiff's duty.  The Plaintiff was responsible for conducting more than the majority

of the investigations.  The Plaintiff was also responsible for conducting almost all of the

interviews and interrogations. The Plaintiff was responsible for reading all the incoming

incident reports, maintaining all of the files, maintaining both evidence closets, and,

preparing all spreadsheets and reports for the weekly meetings with Student Life.

Robert Maglia reported to work each day and placed his feet on top of his desk while he

laid back in his chair and played with his cell phone for most of the day; until it was time

for him and Director Fox to go out to lunch together, and until it was time for him to go

home.

The Plaintiff was given so much work during each day that she had to work through her

lunch hour almost every day.  And, the Plaintiff also stayed late almost every day to

complete all necessary reports and investigations before any due dates. And, the

Plaintiff most often did not complete an overtime slip when she stayed late most nights.

The Plaintiff strongly believed that Director Fox's reasoning for burdening and

inundating her with an excessive work load, was because he was extremely upset and

annoyed that Terrance Sawyer did not instantly terminate the Plaintiff from her position

as an Assistant Investigator/Title IX Investigator during their meeting; and, because

Director Fox had extreme bias and racist views toward African Americans and females.

Director's Fox unfair and bias treatment towards the Plaintiff continued relentlessly

throughout the year.

6.  In **September 2014**, the Plaintiff filed a complainant of Harassment/Discrimination and

Bias Acts against Director Timothy Fox, again with the Loyola University Maryland

Human Resources Department.  During that time, the Plaintiff also asked the

representatives of Human Resources to conduct an investigation into the fact that

Director Fox was paying the Plaintiff, a considerable, less amount of income than her

Caucasian, male co-worker, Robert Maglia who had almost no work responsibilities each

day.  Also, when the position of Assistant Investigator was advertised and posted, the

position was posted as a Sergeant's position.  The Plaintiff immediately realized she was

not receiving Sergeant's pay.  The Plaintiff also realized that Robert Maglia "earned"

more than $15,000 more than her; and he did almost nothing on a daily basis.  Thanks

to the Former Assistant Director, Sean Kapfhammer; the Plaintiff became aware of the

pay of Robert Maglia and the pay of each of the Sergeant.  The Sergeants were being

paid almost $10,000 more than the Plaintiff.  The Sergeants who were employed with

the Loyola University Maryland Campus Police Department at that time were:  Stephen

Konarski (a Caucasian, male), Michael Guzman, (a white, Hispanic male), and Rufus

Dawson (an African American male).  The Former Assistant Director, Sean Kapfhammer

showed the Plaintiff a report detailing every Campus Police Officer, Sergeant, Lieutenant

and Investigators' pay rate who were employed with the Loyola University Maryland

Campus Police Department.

**PRIOR HARASSMENT**

7. **September 03, 2014**, Timothy Fox conducted the bi-weekly Staff meeting at 5104 York Rd.

in the conference room.  Present during the meeting was the Plaintiff along with Sean

Kapfhammer (Asst. Director) Jocelyn Kelly, a Caucasian, female (Assistant Director for

Access Control and Communications), Denise Thompson, a Caucasian, female (Day Shift

Lieutenant), Joseph Jefferson, an African American, Male (Former 4x12 Lieutenant),

Stephen Konarski, a Caucasian, Male (Day Shift Sergeant), Rufus Dawson, an African

American, male (former midnight Shift Lieutenant and former Assistant Director),  Patrick

Weber, Caucasian, Male (Access Control Technician), Robert Zeigler, Caucasian, Male

(Report Writing Sergeant), and Robert Maglia.  During the meeting, Timothy Fox went around the table and asked everyone his/her suggestions on how Campus Police can better execute "move-in" days for the Loyola University Maryland students.  Timothy Fox listened to everyone who gave his/her suggestions and recommendations as to how to make the "move-in" process easier.  Timothy Fox then asked the Plaintiff for her suggestions last. After the Plaintiff gave her listed suggestions, Timothy Fox stated, "I asked for suggestions and you had a list of things. Are you finished bitching now?"  The Plaintiff was the only person that Timothy Fox verbally condemned for giving her suggestions.

8.  **September 09, 2014,** Timothy Fox, Robert Maglia and the Plaintiff responded to the Office of Student Life to meet with Student Life representatives for their scheduled weekly meeting.  Also attending the meeting was Christina Spearman, a Caucasian, Female (Former Director of Student Life) and Robert Bacon, a Caucasian, male (Former Associate Director of Student Life).  During the meeting, all attendees were discussing an incident that occurred on September 07, 2014 involving several Loyola University Students (Baltimore City Police Report #14-512924) in which Baltimore City Police Officers had to respond to 2007 Girard Ave; where six Loyola University Maryland students resided in off campus housing.  All six of the students were subsequently placed under arrest for disorderly conduct on that particular night.  During the discussion of the incident, Timothy Fox explained to everyone in the meeting, what a horrible neighborhood 2007 Girard Avenue was.  Fox continued by saying, he could not believe that Loyola students lived in that neighborhood; as he chuckled and brandished a smirk across his face.  Fox then turned to the Plaintiff and asked the Plaintiff if she knew where the location was. When the Plaintiff replied, she was not familiar

with the address or location; Timothy Fox continued to talk about how bad the neighborhood was and that it was in a horrible area.  Fox then stated, the neighborhood was directly across from the Druid Hill Park area as he laughed out loud and said, "Yeah, some of our kids live in awful neighborhoods."  As Fox continued to express what a horrific neighbor the area was, he once again turned to the Plaintiff, looked her directly in her eyes and said with a smirk on his face, "You don't live over there, do yah?"  And, then Fox continued to laugh along with everyone else in the meeting; as he waited for a reply from the Plaintiff.  At that point, the Plaintiff was more than sure that her reaction and the look which was upon her face displayed a combination of shock, anger, mortification and embarrassment (for Fox).  The Plaintiff's reply to Fox was "Now why would I live in that neighborhood?"  As Fox continued to laugh even harder, he then said, "I just thought that I would ask.  At least I asked."

At that time, Christina Spearman who also appeared to be shocked by Timothy Fox's degrading statement to the Plaintiff, said, "Oh no, please don't let me have to investigate a bias related incident in my office."  Also, immediately after Timothy Fox made that statement: Robert Bacon, slide down in his chair.  Then, he placed a tissue underneath his glasses that covered his entire face.  Robert Bacon then said to the Plaintiff; "Please don't say anything to him in here.  Wait until you all get in the car and then talk about it."

Timothy Fox's comment to the Plaintiff was deliberate and meant to be degrading. Following the meeting, Timothy Fox, Robert Maglia and the Plaintiff all returned to the Public Safety Building.  Immediately upon their return to the office, the Plaintiff was so disturbed by Timothy Fox's blatant display of bias harassment; she told Bob Maglia that she

9

was going to walk to Human Resources and would be back.  The Plaintiff did respond to

Human Resources, (5000 York Rd., and 2nd floor) and requested to speak to Monica Lim

(former HR representative for Campus Police).   Ms. Lim was not available at that time.

9.  **September 10, 2014,** at approximately 11:30 am, Timothy Fox asked the Plaintiff to

meet him in his office.  During the meeting, Fox and the Plaintiff discussed the eight

sexual assaults which were reported to Campus Police; and, they spoke about all the

other reported incidents which would be included in the Annual Security Report/Clery

numbers.  Timothy Fox, Sean Kapfhammer, Dennis Cornwall (Caucasian male, Campus

Police Training Coordinator), and the Plaintiff had been reviewing the reported crime

numbers for Clery for the majority of the month.  After the brief meeting with Timothy

Fox, the Plaintiff returned to her office.  Approximately ten minutes after the Plaintiff

returned to the office which she shared with Robert Maglia, Timothy Fox entered into

the office and began to question the Plaintiff about two reported sexual assault

incidents; both of which were investigated by former Assistant Director Sean

Kapfhammer  (the October 4, 2013 incident regarding students Katlyn Smith and

Anthony Staitic.  And, also, the November 06, 2013 reported sexual assault incident

regarding students Molly Wolfson and Noel Theroux).  Initially, when Timothy Fox began

to question the Plaintiff about the incidents, he had what appeared to be a smirk upon

his face which made him appear to be plotting some sort of an attack.  Basically,

Timothy Fox was asking the Plaintiff, why weren't there incident reports in the Navigate

Report Data base for the two, aforementioned investigations which were conducted by

Sean Kapfhammer?  When the Plaintiff reminded Timothy Fox that Campus Police

10

received the reports of the two sexual assaults via Student Life weeks after the alleged

incidents occurred, Fox continued to ask the Plaintiff; "Why didn't Sean Kapfhammer

write a report for the incidents?"  Then Fox stated, "Don't you think that reports should

have been written for the incidents?"  He continued by saying in a condescending tone,

"I just want to know; what, do you think?" Timothy Fox voice began to get loud as he

appeared to become angry.  Again, the Plaintiff explained to Timothy Fox that those

incidents were investigated by Sean Kapfhammer and she could not answer for what

Assistant Director Sean Kapfhammer did or did not do.   Timothy Fox began to go on and

on like a tyrant.  Fox then told the Plaintiff, that she needed to find out the reason that

Sean Kapfhammer did not write the reports for the sexual assaults incidents which he

investigated. Then, Timothy Fox began to question the Plaintiff about every sexual

assault that had been reported to Campus Police and/or Student Life.  Fox wanted to

know if the Plaintiff had incident reports for all the sexual assaults that were brought to

Campus Police's attention.  Timothy Fox then started to tell the Plaintiff, that she should

have an incident report in the Navigate System for every reported Sexual Assault.  When

the Plaintiff showed Fox all the reported Sexual Assault incident reports (with the

exception of the reports Sean Kapfhammer were responsible for); Timothy Fox then

started questioning the Plaintiff, about the location of all the case folders of all the

incidents that were investigated by the Campus Police Investigators'.  Timothy Fox then

asked the Plaintiff, did she know if Sean Kapfhammer had completed case folders for

the sexual assaults which he had investigated.   And, Fox stated that the Plaintiff needed

to find out from Sean Kapfhammer, why he did not write a report for the reported

incidents.   And, the Plaintiff also needed to find out if Sean Kapfhammer completed a

case folder for each reported incident.  The Plaintiff immediately explained to Timothy

Fox, that he had hired Sean Kapfhammer, to be the Campus Police Assistant Director.

And that, the Plaintiff would not approach the Assistant Director of Public Safety to ask

him about what he did or did not do to complete the sexual assault investigations that

were assigned to him.  The Plaintiff reminded Director Fox, that type of questioning

regarding his Assistant Director's investigation; was above her pay grade. The Plaintiff

again reminded Timothy Fox that she was the Investigator and not Assistant Director

Sean Kapfhammer' s direct supervisor.  Director Fox then "rolled" his eyes at the

Plaintiff and stormed out of the office.  Timothy Fox's harassment and hostile treatment

towards the Plaintiff continued throughout the year.  A lot of Fox's hateful and bias

treatment towards the Plaintiff was very memorable.  For example:

10.  **September 02, 2015,**  (the 1st staff meeting of that school year); the Plaintiff was the

only person of color who attended the Staff Meeting. Director Timothy Fox went around

the table (starting with the left side of the table); and, asked if anyone if he/she had

anything to say.  When Timothy Fox got to the Plaintiff who was seated closes to him

(on the right side of the table), he looked directly into the Plaintiff's  face; did not ask

the Plaintiff if she had anything to contribute to the meeting; but, Fox continued to

speak as if the Plaintiff  did not exist. (Which he had done to the Plaintiff on many other

occasions).

At that time, the Plaintiff made a comment to remind Fox; that she indeed had

something to say to contribute to the meeting.  The reason that the Plaintiff mentioned

this incident, because this was one of the settle acts of blatant racisms that she

experienced from Mr. Fox whenever she was the only person of color who attended the

Staff meetings or Student Life meetings that were headed by Fox.  Timothy Fox would

either sarcastically try to demean the Plaintiff; or, he would pretend that the Plaintiff did

not exist.

11. **December 14, 2015**, Dr.  Sheilah Horton, an African American, female (the former Vice

President of Student Conduct and Campus Police) attended the Staff meeting.  Also,

Adrienne Wood, an African America, female (Support Operations Coordinator) attended

the staff meeting for the 1st time.   During the staff meeting, Timothy Fox announced

that Jocelyn Kelly, a Caucasian, female (Assistant Director of Access Control and Support

Operations) would be taking over the responsibilities that Robert Ziegler (who resigned

from the University because he and Jocelyn Kelly did not get along).  And, Fox also

announced; Jocelyn Kelly and Dennis Cornwall, (Caucasian, male) would be the persons

working with him on the Clery numbers and the Annual Security Report.  Timothy Fox's

announcement was significant because prior to that announcement, one of the

Plaintiff's responsibilities was to keep track of all the Clery reportable crimes and to help

Dennis Cornwell with the written portion of the Annual Security Report.

Prior to that meeting, Timothy Fox never discussed with the Plaintiff that he no longer

wanted her to be responsible for the Clery numbers and helping with the written

portion of the Annual Security Report.

12. **In 2016**, Campus Police 2nd session of In-Service Training was held on **May 31st, June 1st**

and **June 2nd**.  The Plaintiff attended the second session of In-Service Training.

13. **May 31, 2016**, Dennis Cornwall and the Plaintiff were engaged in a conversation just outside of the In-Service Training classroom.   During the conversation, the Plaintiff told Dennis that Terrance Sawyer (Vice President for Advancement) had approached her at the graduation ceremony (May 2[1,] 2016) and thank her for the work that she had done on a sexual assault investigation, involving a Loyola student as the victim; where the Plaintiff played a large, instrumental part in getting the unknown, non-student suspect identified and prosecuted.   Terry Sawyer also told the Plaintiff, "Tim (referring to Timothy Fox) should have written you up for an accommodation."

The Plaintiff, also told Dennis Cornwell about the statement that Terrance Sawyer made regarding the accommodation that he thought Timothy Fox should have written the Plaintiff up for.   [A side note: immediately after the suspect in the sexual assault was identified and arrested, Robert Maglia suggested to Director Fox, in the presence of the Plaintiff; that he (Fox) should write the Plaintiff up for an accommodation.   Director Fox answered in an annoyed and disgusted tone while looking directly at the Plaintiff, "I'm not writing her up for nothing!   So, I'm supposed to write her up for doing her job?"]

The Plaintiff simply shook my head and replied, "Wow!"

14. **June 1st, 2016**, when Dennis Cornwall released the In-Service class to go to lunch, the Plaintiff stopped in her office located at 5104 York Rd.   Shortly thereafter, upon hearing the Plaintiff's voice in the office, Director Fox called Robert Maglia on his office telephone.   When, Maglia hung the telephone up; he turned to the Plaintiff and said, "Tim wants to meet with us in his office."   Bob Maglia and the Plaintiff responded to Tim Fox's office.   Immediately upon Maglia and the Plaintiff's entering the office, Tim Fox

14

went on a 10 minute rant about who he thought would be deserving of a "write up" or an accommodation.  Tim Fox stated, the only person whom he would probably write up for an accommodation would be Dennis Cornwall.  Then after a few seconds, Fox stated he might even write Rufus Dawson up for an accommodation; because they both completed the Master's degree program while they were working at Loyola University. Then Fox stated, he had already written up Dennis Cornwall for an accommodation before.  Tim Fox also stated to the Plaintiff, he would never write her up for an accommodation.   After Tim Fox's ten minute rant, he then said; "I'm working on a report for Sheilah Horton. She needs to know how many calls campus police has handled so far this year.  And, she needs to know the type of calls campus police handled."  Director Fox then asked the Plaintiff if she knew how to generate the Statistical Report using Navigate.  The Plaintiff replied, "Yes".  Tim Fox then state, "Go get me that report!"

15. **June 2nd, 2016**, the second day of In-Service Training; all of the participants were asked what they thought about the In Service -training which they had received; the Plaintiff along with more than the majority of the participants (Campus Police Officers, Sergeants and Lieutenants) expressed that they thought the training was insufficient.  After that week of In-Service Training, when the Plaintiff returned to her office, she immediately noticed that Timothy Fox stopped inviting her to important work related meetings.  And, Timothy Fox and Dennis Cornwall stopped speaking to the Plaintiff; and they also refused to address the Plaintiff.  When the Plaintiff spoke to Dennis Cornwall who was initially the Plaintiff's friend, he would more than often not speak to her or sometimes

speak to her in a very harsh tone.  Dennis Cornwall and Timothy Fox both were angry

that the Plaintiff voiced her opinion when asked to do so, regarding the In-Service

training.

16. **July 12, 2016,** the Command Staff meeting was scheduled for 1:00 pm in the conference

room located at 5104 York Rd.  Dr. Sheilah Horton attended the meeting.  During the

meeting, Dr. Horton posed the question to everyone who attended the meeting,

"Would we, Campus Police be prepared if we had an Active Shooter situation on

campus?"  At that time, the Plaintiff reiterated the concerns that she and campus police

officers expressed regarding preparedness, lack of training and the lack of necessary

equipment needed to perform the duty of policing during such a critical situation.

Those elements alone, coupled with poor management made Loyola University

Maryland Campus Police unprepared in the event of an Active Shooter situation.

17. **August 2nd, 2016**, the Plaintiff received a meeting invite via "Outlook" from Director

Timothy Fox, to attend a "Clery Report 2015 Statistics Meeting" which was scheduled

for August 19, 2016 from 9:00 am – 11:00 am.  Initially, the Plaintiff thought that the

invite was sent to her by accident due to the fact that she had not been invited to any of

the prior Clery meetings; which Director Fox held numerous times with Jocelyn Kelly and

Dennis Cornwall.  And, according to Director Fox, the Plaintiff was no longer responsible

for managing and calculating the Clery numbers since Director Fox had announced that

he had given that responsibility to Jocelyn Kelly.  There, the Plaintiff declined the invite.

18. **August 15, 2016**, the Plaintiff requested vacation leave for August 19 and 22nd.  The

leave request was approved by supervisor, Robert Maglia.

19. **August 17, 2016** at approximately 8:30 am, as soon as the Plaintiff, walked into the investigators' office, Robert Maglia said to her, "Tim wants to see you."  When the Plaintiff asked Bob, "Why does Tim want to see me?"  Bob stated, "He wants to talk to you about the Clery numbers."  When the Plaintiff entered into Director Fox's office, the first statement which he made to the Plaintiff was, "You look nice today.  Where are you going?" (The fact that Fox actually said something nice to the Plaintiff, completely surprised the Plaintiff – Fox had never complimented the Plaintiff). Then Director Fox stated, "You know the big book that you do every year for Clery? I need you to do the big book and the Clery numbers.  And, I need it done by Friday (August 19, 2016)."  At that time, while the Plaintiff was in total shock, the Plaintiff reminded Director Fox that she had not done anything with the Clery numbers because he announced that, Jocelyn would be doing the Clery numbers and the Clery report for the 2015 year.  Also, the Plaintiff reminded Director Fox that she had not been invited to any of the prior meetings; therefore, she was completely out of the loop of things when it came to the statistical numbers (which the Plaintiff normally used the entire summer to review all the yearly incident reports; update or change incidents, in order to calculate the Clery statistical numbers). The task was daunting, tedious and time consuming which was way the Plaintiff used the majority of the summer to carefully and meticulously reviewed all reported incidents. Director Fox told the Plaintiff that he still needed the book to be completed by Friday (In two days) and he needed the numbers.  And, Fox told the Plaintiff to do what she could even if she had to stay all night.  The Plaintiff worked on the Clery numbers and pulled the yearly reports for review.  The Plaintiff did as much of

the work as she could do within the two days (Wednesday and Thursday). The Plaintiff

left the uncompleted Clery Book in Director Fox's mailbox on the night of (August 18,

2016). The Plaintiff left Director Fox a note that said, she was still working on the Clery

numbers.

**RETALIATION**

20. **August 19, 2016**, the Plaintiff was off from work, on a scheduled vacation day. On the

same date, at approximately 8:09 am, the Plaintiff received an email from Director Fox

which stated that the 2015 Clery Report Meeting was cancelled. At approximately 2:00

p.m. on the same day, Rufus Dawson, an African American, male (the Assistant Director

for Campus Police); contacted the Plaintiff via telephone. Rufus Dawson informed the

Plaintiff, that he overheard Director Fox, Robert Maglia and Dennis Cornwall plotting

together about how they planned to get the Plaintiff fired from her job. According Asst.

Director Dawson, Timothy Fox was angry that the Plaintiff did not work around the clock

to complete the Clery book. Officer Melvin Sommer, Caucasian, male (Campus Police

Officer) told Dennis Cornwall weeks prior that he had seen the Plaintiff using the 2004

Impala (which was an unmarked vehicle assigned to the Investigators' office); and that

the Plaintiff had probably taken the vehicle home. Dennis Cornwall told Director Fox

that the Plaintiff had used the vehicle. Rufus Dawson also told the Plaintiff that he

heard Director Fox tell Robert Maglia to make the Plaintiff write an administrative

report explaining if or if not she had taken the vehicle home (Tim Fox and Robert Maglia

were hoping that the Plaintiff would say that she did not use the vehicle so that they

could have her charged for a false report); and they were planning to use the "false"

report to subsequently get the Plaintiff terminated from her Investigative position at
Loyola University Maryland.

21. **August 22nd, 2016** at 10:24 am, Robert Maglia sent the Plaintiff a text message which
stated, "You working today?"  The message seemed strange to the Plaintiff, since she
had requested a vacation day to be off; which the leave slip was signed and approved by
Bob Maglia.  And, Bob had never texted the Plaintiff asking if she was coming to work or
not.  The Plaintiff replied, that she had the day off which he had approved.

22. **August 23, 2016**, when the Plaintiff returned back to work, Robert Maglia was out sick.
Although, the Plaintiff saw Director Fox on that day, Fox never asked the Plaintiff
anything about the use of the impala.  Robert Maglia also called out sick on August 24th
and 25th, 2016.  Again, Director Fox never asked the Plaintiff anything about her use of
the unmarked vehicle.

23. **August 24, 2016,** Robert Maglia called in and requested another day off from work.

24. **August 25, 2016** at 9:08 a.m., Robert Maglia left a message on the Plaintiff's work
telephone requesting that, the Plaintiff call him.  When the Plaintiff returned the call
and spoke to Bob, he asked the Plaintiff if anything was going on in the office.  The
Plaintiff told Bob Maglia, that nothing was going on.  Bob, then asked the Plaintiff, if
there was anything that he should know.  Again, the Plaintiff replied, "no, nothing that
she knew of."

25. **August 26, 2016** at approximately 8:30 a.m., (On a Friday), Robert Maglia returned to
work.  At approximately 11:30 a.m., Bob Maglia and Director Fox left the building to pick
up their lunch.  At approximately 2:30 p.m., Bob returned to the Investigators' office and

sat down at his desk. The Plaintiff was seated at her desk. Then, Bob "casually" stated, "Oh, the week that you went to the conference, did you use vehicle 974?" The Plaintiff replied, "No, Miss Donna gave me a vehicle from the transportation's fleet." Bob then stated, "Well, the computer "automatically" generated a report that you had 974 vehicle the week-end of 08/12/16 – 08/16/16 (He handed the Plaintiff, the copy of the report which was dated 08/22/16). Maglia then asked the Plaintiff, if she had used the vehicle. The Plaintiff replied, "Yes, I had the vehicle that week-end." The Plaintiff continued and told Bob that she had to use the vehicle to get home because her daughter had used her personal vehicle that day. And, The Plaintiff's personal vehicle had broken down in Washington, D.C. Therefore, the Plaintiff used the departmental vehicle 974 to get home on 08/12/16, (a Friday). And, because it was extremely hot and the Department of Transportation had closed the subway due to the fact that they were cleaning the tracks, the Plaintiff had no other mode of transportation to return home. And, since Tim Fox had allowed the Plaintiff to use the vehicle on prior occasions, overnight before, the Plaintiff did not discern an issue with using the vehicle again. The Plaintiff also informed Robert Maglia, that she returned the vehicle on Monday, August 15, 2016 when she returned to work. The Plaintiff had forgotten to put the vehicle keys back in the box on that date. After Maglia listened to the Plaintiff's explanation regarding her use of the vehicle, he just stood in front of the Plaintiff's desk; and, he said nothing (As if he was thrown off by the Plaintiff's response and as if he was thinking about what to say next). After a few minutes went by, the Plaintiff stated again, "Yes", I used the vehicle and what?" Again, Bob said nothing. He was still standing in front of

the Plaintiff's desk as if he was in shock.  Again, the Plaintiff replied; "I used the vehicle, what do you want?"  At that point, Maglia stated, "I think you better write me an administrative report."  The Plaintiff then retrieved her thumb drive from her purse and printed out the administrative report that she had already written while she was at home, on her day off.  (Rufus Dawson had already told the Plaintiff that Director Fox, Bob Maglia and Dennis Cornwall were plotting to come up with an excuse to get the Plaintiff terminated from Loyola University Maryland by requesting that she write an Administrative report).

The Plaintiff then handed Bob Maglia a copy of the administrative report.  Maglia took the report and quickly walked over to Director Fox's office.  When Maglia returned to the Investigators' office, he sat down at his desk and said nothing.  At approximately 4:30 p.m., Bob Maglia left to go home.  Nothing else was said about the administrative report.

26. **August 29, 2016**, the Plaintiff was off from work.  Robert Maglia sent the Plaintiff a text message asking her if she had taken the administrative report that she had given him; off his desk.  The Plaintiff texted Bob Maglia back, "No."

27. **August 30, 2016**, when the Plaintiff returned to work; she asked Robert Maglia if he had found the Administrative Report.  He replied, "No." The Plaintiff then told Bob that she saved the Administrative Report on her thumb drive. And, the Plaintiff told Bob that she could give him another copy of the report.  The Plaintiff, printed Bob out another copy of the report and handed the report to him.  After that, Neither, Robert Maglia nor Director Fox, addressed the Plaintiff about the administrative report.

28. **August 31, 2016** at approximately 12:02 p.m., the Plaintiff forwarded an electronic copy of the administrative report that she had written regarding the use on 974 vehicle to Director Fox, Robert Maglia, Asst. Director Dawson and Maryalice Meister of Human Resources.  At approximately 2:00 p.m., Director Fox and Asst. Director Dawson met with Dr. Sheilah Horton.  At that time, Director Fox requested permission from Dr. Horton to have the Plaintiff terminated from Loyola University.  Assistant Director, Rufus Dawson returned from the meeting and informed the Plaintiff about everything that was said during their meeting with Dr. Sheilah Horton.  Rufus Dawson (Rudy) also told the Plaintiff that Tim Fox was extremely upset when Dr. Horton told him that she would not terminate the Plaintiff for using an unmarked vehicle that is assigned to the Investigative Unit.  Rufus Dawson said, Tim Fox was so upset that he did not get permission to terminate the Plaintiff, that during the drive from Jenkins Hall back to 5104 York Rd., Tim Fox began to bang his fist on the steering wheel of his vehicle.  And he shouted, "I can't stand her.  That bitch!  They are protecting her!  I can't believe that I can't fire her!"  Rudy Dawson told the Plaintiff that he was in the vehicle with Fox when Fox made the statements.

29. **September 6, 2016,** the Plaintiff filed another report of Harassment/Discrimination and Retaliation with the Human Resources Department.  The Plaintiff requested that an investigation be conducted.  The Plaintiff also carbon copied Dr. Sheilah Horton and Kathleen Purnell, Caucasian, Female (Vice President of Human Resources) the typed written complainant.  Months later, Rufus Dawson informed the Plaintiff; that Tim Fox was given a strong letter of reprimand from Dr. Sheilah Horton; and, Fox was ordered to

attend Diversity Sensitivity classes every Wednesday evenings for months as a result of the Human Resources investigation regarding the Plaintiff's Administrative Letter of Complaint dated August 26, 2016 and Report of Harassment/Discrimination and Retaliation dated September 06, 2016.

30. The Plaintiff honestly believed that Director Fox was upset that she could not review and complete a year worth of Incident Reports for the Clery Statistical reporting numbers in a two day period of time before August 19, 2016.  Under normal circumstances, the Plaintiff would have used the entire summer to review all the incident reports for the prior year; determine if all the incident reports were correct; and change or modify any needed reports.  Then, the Plaintiff would collect the Clery Incident numbers based upon where the incident occurred.  The Plaintiff had to review all reported Murder and Manslaughter incidents, all reported sexual assaults (forcible and non-forcible), all reported Robbery incidents, all reported Aggravated Assault incidents, all Burglary incidents, all Motor Vehicle Theft incidents, all Arsons, all Liquor Law Violations, all Drug Law Violations, all reported Illegal Weapons Violations, all Dating Violence and Domestic Violence Violations, all Stalking and Harassment Violations, and all Hate/Bias Violations. Then the Plaintiff would have had to determine if the aforementioned violations occurred on or off Campus, adjacent to campus, on public property, on any property leased, rented or owned by the University.  It would have been impossible for the Plaintiff to complete months of review in just two day; **IMPOSSIBLE!** The Plaintiff, left the uncompleted 2015 Clery book binder in Director's Fox door box on August 18, 2016; so that he could present the numbers at his meeting.

Director Fox cancelled his meeting on August 19, 2016 because he was unprepared for the meeting. Jocelyn Kelly did not do the work on the Clery numbers that Timothy Fox assigned her to do. Also, the Plaintiff truly believe that Director Fox was already upset with the fact that the Plaintiff along with other Command Staff members; and, officers spoke out about the training and lack of equipment during the In-Service Training. And, when Dr. Horton was present at the Command Staff meeting on July 12, 2016, the Plaintiff also informed her of the officer's concerns. In conclusion, based on the information that Rudy Dawson provided the Plaintiff, Director Fox request to have the Plaintiff fired, had nothing to do with the Plaintiff using the 2004 Impala over the week-end of August 12-15. Especially since, Director Fox had given her permission on numerous prior occasions to take the vehicle home since she was usually the On-Call Investigator on the week-ends for any Sexual Assault related incidents or Clery Related Incidents that needed immediate attention.

31. Director Fox had already made the decision that he was going to try and have the Plaintiff terminated; prior to him telling Bob Maglia to ask the Plaintiff to write an Administrative Report explaining why she used the vehicle. Even after the Plaintiff, presented Robert Maglia with the Administrative Report, Director Fox still wanted to have the Plaintiff terminated. If in fact, the Plaintiff's use of the vehicle was the reason that Director Fox wanted her terminated from Loyola University Maryland, why did he wait almost 2 weeks after she had used the vehicle; to request that she be terminate. Also, during the time that the Plaintiff was assigned to the Investigators' Unit, she noticed from Director's Fox facial expressions, behavior towards her, and things that he

24

had said to her; that he had an unwarranted distain towards her.  And, based upon statements that Director Fox made to the Plaintiff; the Plaintiff truly believed that Director Fox disliked her simply because she was not a Caucasian male.  And, Director Fox disliked that fact that the Plaintiff worked hard and was liked by other colleagues on campus.  If the Plaintiff was a white male, Director Tim Fox would not have had a problem with the Plaintiff.   Director Fox had a problem with women (particularly women of color).  Fox barely tolerated the women who worked for Campus Police.  Fox had a superiority complex.  He treated most women as if they were beneath him.  Director Fox particular had a noticeable distain and problem with women of color.  Director Fox once said to the Plaintiff, "He thinks that things were better when woman stayed at home and raised the kids; instead of going out to work."

32. **December 22, 2016,** Katsura Kurita, an Asian female (Assistant Vice President for Student Development and Title IX Deputy for Students) sent an email which was addressed to Daniel Kelly, a Caucasian male (Assistant Director for Student Life) and the Plaintiff.  The email stated that she was assigning the Plaintiff and Daniel Kelly a Title IX investigation that needed to be completed within a week.  As soon as, the Plaintiff received the case information from Katsura, the Plaintiff told Bob Maglia about the case and also informed him that the investigation was a "red ball" since Katsura needed the investigation to be completed in a week's time.  The Plaintiff and Daniel Kelly could not immediately start the interviewing process of the investigation due to the fact that the students and all non-essential employees left the university for the holiday vacation on December 22, 2016 (The investigators' office was closed at that time).

33. **January 03, 2017**, The University reopened for Staff and Faculty.  Both, the Plaintiff and Daniel Kelly returned to work.

34. **January 04, 2017,** Daniel Kelly and the Plaintiff began to conduct telephone interviews with some of the students who were involved in the complaint.  Also, In-Service FEMA training was scheduled for January 4th and 5th, 2017.  The Plaintiff was supposed to attend the class on January 5th, 2017.   The Plaintiff informed Bob Maglia that she could not attend In-Service training because the Title IX investigation had to take priority.  In fact, the Plaintiff was also working on another sexual assault investigation at the same time (LUPD incident number 2016119-0053386-000146) and Katsura Kurita asked that Daniel Kelly and the Plaintiff put that investigation to the side, so that they could work on and complete "the red ball" investigation.  The Plaintiff informed Bob Maglia of everything that she was doing in the moment, every step of the investigation.

35. In fact, on **January 5, 2017**, Bob and the Plaintiff spoke about the Plaintiff taking the FEMMA class/exam via the web since he and she had already taken the FEMMA class and were both certified when they were employed at the Baltimore City Police Dept. Bob had attended the FEMMA in-service class on January 04, 2017; and, he told the Plaintiff that it was the same information.  And, also on **January 5th, 2017**, Campus Police Officer Sherry Batista, a Caucasian, female, also a former Baltimore City Police Officer; entered the investigators' office (while Bob and the Plaintiff were seated at their desk); Batista stated that she had gotten permission from Timothy Fox to take the FEMMA exam on-line.  In fact, according to Officer Batista, Timothy Fox told her as long as she could produce a certificate stating that she had passed the test, she did not have

26

to attend the In-Service Training.  In that moment, the Plaintiff told Bob Maglia that she would complete the exam on-line.  And, Bob told the Plaintiff to just go to the FEMMA website that Dennis Cornwall had provided and get a FEMMA number.  When the Plaintiff went onto the FEMMA website, she noticed that a FEMMA identification number had already been assigned to her when she completed the training at the Baltimore City Police Department.  Therefore, the reason that the Plaintiff did not attend the FEMMA in-service class; she was working on two Title IX cases at the same time; one of which was a red ball.  And, Robert Maglia and Timothy Fox both knew what the Plaintiff was working on.  And, the Plaintiff was also assigned four new Sexual Assault/Title IX investigations upon her completion of the "Red Ball" case.

36. **January 10, 2017 at 8:00 a.m.**, the Plaintiff attended the Campus Police bi-weekly Command Staff meeting which was headed by Timothy Fox.  During that meeting, Tim Fox spoke about the consulting firm (Margolis and Healy) that Dr. Sheila Horton had hired to come and conduct an evaluation of each department within Loyola University Maryland.  Tim also announced that Jocelyn Kelly (Assistant Director of Support Operations Access Control Systems) would be disseminating the schedule which listed the dates that Margolis and Healy Consulting Firm was going to be meeting with department heads and employees.  Jocelyn Kelly then handed out a schedule which denoted the dates and times each person from campus police were scheduled to attend the Margolis and Healy meeting.   According to the initial schedule, Bob Maglia and the Plaintiff were scheduled to attend the meeting with Margolis and Healy on Wednesday, January 18, 2017 at 8:30 a.m. – 9:45 a.m.  The other persons who were scheduled to be

in that meeting were:  Dennis Cornwall (training coordinator), Rose Devon (Admin.

Asst.), Patrick Weber (Access Control Manager), Ronald Pruett (Lock & Key Supervisor),

and, Scott Linenkohl (Access Control Tech.).  Also during the staff meeting, Tim Fox

briefly spoke about the "Table Top" meeting that each department was invited to

attend on Friday, January 13, 2017 at 8:30 a.m. which was going to be held in McGuire

Hall.  At that time, Tim Fox stated to everyone, "Feel free to drop by."

37. **Friday, January 13, 2017**, although the Plaintiff did not receive an invite via e-mail from

Tim Fox to attend the "Table Top" meeting like Bob Maglia and the other Shift

Commanders did, she did attend the "Table Top" meeting.  At the onset of the meeting,

Tim Fox walked over to the table where the public safety officers sat: Rufus Dawson

(Asst. Director), Vincent LoBiondo, a Caucasian, male (midnight shift Lieutenant), John

Goods, an African American, male (4x12 Sergeant), Robert Maglia (Senior Investigator),

and, the Plaintiff were all seated.  When Tim Fox got to the table, he immediately looked

the Plaintiff directly in the face; and his entire facial expression changed.  In that

moment, Tim Fox's face became completely red.  And, he appeared to be angry.  He

then began to briefly talk about what everyone should have been doing to complete the

first exercise.  Tim Fox then walked away from the table visibly upset.  Later, on the

same day, sometime after 2:00 p.m., Bob Maglia and the Plaintiff were in the

investigators' office.  Bob received an incoming telephone call.  The Plaintiff heard Bob

say, "So, I go to the Margolis and Healy meeting on Tuesday and Delsie goes on

Wednesday."  Bob was on the phone for just a few minutes.  When Bob hung up the

phone, he turned to the Plaintiff and said, "Delsie, the schedule for the Margolis

28

meeting has changed. Make sure you go to the meeting on Wednesday. I will go on Tuesday." He then said, "Don't forget. Don't go on Tuesday." Initially, the Plaintiff received an invite to participation in the external review of Public Safety on Tuesday, January 17, 2017 at 4:30 p.m. from Dr. Sheilah Horton.

**38.** <u>Monday, January 16, 2017</u>, Rufus Dawson (Asst. Director) came into the Investigators' office and told the Plaintiff that the schedule had changed again for the Margolis Healy meeting. Rufus Dawson told the Plaintiff, that he would be sending out the new schedule. Rufus Dawson told the Plaintiff to follow the schedule that he was going to send out via email. At approximately 4:09 p.m. on the same date, Rufus Dawson sent out the updated schedule. According to the updated schedule, campus police shift leadership was scheduled to respond to the Margolis and Healy meeting on Tuesday, <u>January 17, 2017 @ 4:30 p.m.</u>   And, on <u>Wednesday, January 18, 2017 @ 8:30 a.m.;</u> Admin/Lock and Key were scheduled to attend the meeting. Therefore, since the Plaintiff was instructed by the Assistant Director of Public Safety to follow the updated schedule, the Plaintiff did just that; and she attended the meeting on Tuesday, January 17, 2017 with the campus police shift commanders; Bob Maglia and the other Campus Police Officers from the Department of Campus Police.

39. <u>***January 17, 2017.***</u> – **The Margolis and Healy Meeting** - <u>*Scenario:*</u>

On the afternoon of the scheduled meeting, at approximately 4:10 p.m., Rufus Dawson, Vinny LoBiondo, John Goods, and, Robert Maglia all left 5104 York Rd. (Campus Police Bldg.) and headed to the meeting. They all rode together in the same vehicle to the College Center to attend the meeting. The Plaintiff exited the building at the same time.

29

The Plaintiff drove to College Center and the parked the impala on Ennis Parallel; directly beside the Crown Victoria which, Bob Maglia and the aforementioned others rode in. Everyone exited the vehicles at the same time and walked over to the conference room where the meeting was to be held. Once the Plaintiff and everyone arrived at the conference room, the men entered the conference room ahead of the Plaintiff. As the Plaintiff was about to enter into the conference room; Bob Maglia stood behind the door of the conference room and immediately turned and stepped in front of the Plaintiff, blocking her from entering into the room. Bob, then said to the Plaintiff, "What are you doing here?" The Plaintiff walked past Bob Maglia and stated, "I'm attending the meeting with my peers." When everyone all sat down at the table; again, Bob who was sitting beside the Plaintiff; turned to her and said, "Why are you here, you were supposed to come tomorrow." The Plaintiff replied, "I'm here because I was invited to be here. I am apart of Fox's command staff/Investigators' Office, just as you are. I am not an employee of the lock and key department." (Lock and Key employee were scheduled to attend the meeting the next day). Immediately, Bob Maglia's face turned bright red. Bob was visibly upset. Bob then grabbed his cell phone, started to dial numbers on the cell phone; got up from the table and exited the room. A few minutes later, Bob returned to the conference room and sat down.

40. **February 2, 2017,** at approximately 2:45 p.m., Robert Maglia and Rufus Dawson entered the Investigators' office where the Plaintiff was seated at her desk. Robert Maglia closed the door behind him and sat at his desk. At that time, Maglia stated to the Plaintiff, "I have some issues that I would like to address with you." And then, Assistant

Director Dawson stated with his head down, "Delsie, I'm just sitting in," as he took a seat at the table.  At that time, The Plaintiff asked Bob Maglia, what was he attempting to address in the meeting.  And, Bob (Robert) stated, "We want to talk to you about you attending the Margolis and Healy meeting; and, you not attending the In-Service Training in January 2017."  At that point, the Plaintiff stated; "Before we go any further, in the wake of everything that has been going on in this department, I would like to request that a representative from Human Resources sit in on this meeting."  At that time, Bob said, "Okay, that is a reasonable request."  Bob then picked up his telephone receiver and dialed some numbers.  The Plaintiff, heard Bob say, "Can I speak with Asha Patel. " A few seconds later, he put the telephone receiver back on the base.  And, he then stated "Asha isn't available."   At that time, the Plaintiff stated; "Until someone from Human Resources is available to sit in on this meeting, I request that we reschedule the meeting."  Bob Maglia and Rufus Dawson both agreed.

41. **Friday, February 3, 2017** at approximately 9:00 a.m., the Plaintiff entered the investigators' office and noticed that Bob Maglia was already seated behind his desk. The Plaintiff immediately asked Bob if he had spoken to anyone from Human Resources about sitting in on the meeting that he wanted to have with her.  Bob immediately answered, "No."  Then, Bob immediately followed up and stated, "I mean yes.  So, this is what we decided to do; we decided not to have the meeting.  We decided to send you an email with the questions that we want you to answer.  Therefore, you can answer the questions via email; also, send the email back to me."  The Plaintiff then asked Bob, why was there a change in the protocol?  Bob replied, "Because that's the way we

decided to do it." Bob then immediately got up from his desk; and walked out of the office. He walked over to Tim Fox's office and remained there for about 45 minutes. Later, on the same day at approximately 1:21 p.m., Bob sent the Plaintiff an email which contained the questions that He and Tim Fox wanted the Plaintiff to answer.

42. **February 08, 2017,** The Plaintiff forwarded the email to Human Resources and filed yet another Complaint of Retaliation and Harassment with the Loyola University Maryland Human Resources department. In the Complaint, the Plaintiff expressed the fact that she had been retaliated against and harassed since she initially filed a Complaint with Human Resources.

43. **May 2017,** the Plaintiff received her Annual Performance Evaluation from Robert Maglia. The Plaintiff noticed that the score that Robert Maglia had given her for her overall performance was considerably lower than any score she had ever gotten on her performance evaluations. Also, the score (3.8 out of 5.0) did not coincide with Maglia's written comments. The Plaintiff also noticed that Bob Maglia put numerous negative opinions on the evaluation that he never addressed with the Plaintiff prior to her receiving her evaluation. The Plaintiff wrote a comment in the Employee Comment section of the Evaluation. Robert Maglia wrote a response to the Plaintiff's comment and submitted it to Human Resources in a letter. In the letter, Robert Maglia falsely accused the Plaintiff of having a poor attitude regarding the investigation of an Armed Robbery that occurred on January 17, 2017. According to Robert Maglia's letter to Human Resources, he stated that the student who was involved in the Armed Robbery, along with his parents were disappointed by the response of Loyola, which led to

32

complaints to the University's leadership. The truth of the matter, Robert Maglia was the Primary Investigator assigned to investigate the robbery case. Maglia had been assigned the case for three weeks before he decided to conduct an interview with the student. The student and his parents complained because Bob Maglia did absolutely nothing with the case. Then, he tried to blame the Plaintiff for failing to conduct an interview which he should have conducted the day that the Armed Robbery occurred. Bob Maglia never gave the Plaintiff a copy of his letter or response.

44. On **May 2, 2017,** the day that Bob Maglia submitted his response to the Plaintiff's comments regarding the Plaintiff's Performance Evaluation, to Human Resources, Rudy Dawson asked the Plaintiff to meet him outside of 5104 York Rd. Rudy Dawson told the Plaintiff that Tim Fox had written the response for Bob Maglia. According to Rudy Dawson, Tim Fox and Bob Maglia were in Tim's office all morning plotting about how they were going to get the Plaintiff terminated. They were also working on the response at the same time. Additionally, Tim Fox and Bob Maglia responded to Human Resources with the letter. Immediately after Tim and Bob finished typing the response letter, they talked about how they planned to get the Plaintiff terminated from her position. According to Rudy Dawson, Tim Fox and Bob Maglia met Kathleen Purnell (VP Human Resources) and they both asked Kathleen Purnell for permission to terminate the Plaintiff. Rudy Dawson stated, he was also present in the meeting. After Rudy told the Plaintiff everything that was said in the meeting, Rudy Dawson then placed a balled-up paper in the Plaintiff's hand. When the Plaintiff opened the paper, she noticed that it was a copy of the letter "Response to Comments" that Tim Fox and Bob Maglia had

33

taken to Human Resources.  Tim Fox and Bob Maglia, never gave the Plaintiff a copy of the response.

45. **May 19, 2017**, Bob Maglia and the Plaintiff were sitting in the Investigators office at their desk.  Bob Maglia was typing something on his computer.  He then turned to the Plaintiff and said, "Oh, by the way, I forgot to give you a copy of my response to the comments you made on your evaluation."  Bob printed out a copy of his response and handed the paper to the Plaintiff.  The Plaintiff noticed that the response was completely different from the response that he and Tim Fox had submitted to Human Resources.

46. **June 2017,** Dr. Sheilah Horton resigned from Loyola University Maryland.  Joan Flynn was promoted into Dr. Horton's former position.  And, as a result of the Complaints that the Plaintiff filed with Human Resources, the Plaintiff Timothy Fox and Robert Maglia became even more aggressive in retaliating against the Plaintiff upon Dr. Horton's departure from the University.   According to Rufus Dawson, immediately after Dr. Horton was no longer employed at Loyola University, Tim Fox had a meeting with Kathleen Purnell, a Caucasian, female (Vice President for Human Resources and close friend to Timothy Fox) and tried to convince her to terminate the Plaintiff from employment with Loyola University Maryland for taking an unmarked departmental vehicle home in August 2016.  Timothy Fox and Robert Maglia had been "black balling" the Plaintiff since she last filed a Complaint with Human Resources.

For example, Tim Fox refused to invite the Plaintiff to meetings were essential to her job; and, growth as an employee.  Tim Fox and Robert Maglia treated the Plaintiff as if

she was not an employee at the University who was a part of the Campus Police Department.  Tim Fox and Robert Maglia simply ignored the Plaintiff on a daily basis. And, the Plaintiff felt that Tim Fox and Robert Maglia were looking for any excuse to "write her up" so that they can generate a paper trail to justify a constructive termination.  During the time that the Plaintiff was employed with Loyola University, she witnessed more than twenty instances where Bob Maglia, and, other supervisors and campus police officers (Majority of whom were Caucasians males and females) should have been "written up" for inappropriate behavior in the work place and failing to do assigned jobs; but they were never given any sort of reprimand.   The Plaintiff can name at least ten occurrences off the top of her head.  But, instead of dealing with the real issues that need to be addressed, Timothy Fox and Robert Maglia chose to harass and create a hostile environment for the Plaintiff, by trying to write her up and have her terminated for situations that did not warrant such disciplinary actions.  Due to the hostile environment that Timothy Fox and Robert Maglia continuously created for the Plaintiff, it was difficult and almost impossible for the Plaintiff to work in such an environment.   The Plaintiff went home each day and returned to work the next day, worried about what new situation she was going to encounter, dealing with Timothy Fox and Robert Maglia's mentality of "We're going to get her by any means necessary." The Plaintiff became ill and was diagnosed by her doctor to have High Blood Pressure, and, Type II Diabetes.  The Plaintiff was placed on medication to control and maintain the medical conditions.  The Plaintiff became tired and frustrated from witnessing and experiencing Timothy Fox and Robert Maglia, use their position and power of authority

to intimidate, harass, manipulate and create a hostile environment for the Plaintiff and others; especially the African American women and men under their supervision.  By the end of the summer in 2017, at least ten or more African American women/women of color, and African American men, who were all employed with Loyola University Campus Police, had filed Discrimination complaints against Timothy Fox; with the Loyola University Human Resources Department.  In August of 2017, the Plaintiff filed realized that Human Resources Representatives, particular Kathleen Purnell (Vice President for HR) wasn't doing anything to prevent Timothy Fox, Robert Maglia and other supervisors from creating a hostile work environment for women of color and the African American men who worked for Campus Police; the Plaintiff filed a Complaint with the U.S. Equal Employment Opportunity Commission,  along with Darlene Wing, an African American female, (4x12 Sergeant for Campus Police), Andrea' Bass, an African American, female, (Campus Police officer), and Sherry Batista, a white/Hispanic, female, (Campus Police Officer).  Sherry Batista and Andrea' Bass resigned from their position as Campus Police Officers due to the continuous harassment that they received from Timothy Fox and other male supervisors who were instructed by Timothy Fox to harass, intimidate and to create a hostile environment for those who filed Complaints against with Human Resources or EEOC.

47. On **January 12, 2018**, Timothy Fox (former Director of Public Safety) was forced to retire from his position at Loyola University Maryland after Human Resources and EEOC received numerous complaints from African American Campus Police Officers regarding the unfair and discriminating treatment Timothy Fox imposed upon African American

men and women. The decision appeared to be in the best interest of the University that Timothy Fox retired from his position. Rufus Dawson (Former Assistance Director of Public Safety) was assigned to be the interim Director of Public Safety from Jan. 12, 2018 until July 15, 2018; or until a new Director of Public Safety was hired.

48. **April 12, 2018,** at approximately 11:15 a.m., Timothy Fox came back to the Loyola University of Maryland campus to visit. Fox also responded to the Campus Police Building (5104 York Rd.) and entered the Investigators' office. Tim Fox said to Robert Maglia, "Bobby, give me your swipe (Identification card). I need to go up to see Joanie (referring to Joan Flynn) and Jocelyn (referring to Jocelyn Kelly)." Tim Fox was telling Robert Maglia to give him his Loyola University Maryland identification card so that he could use the card to swipe into locked buildings and/or doors. He then told Bob Maglia, that he would be back later to meet him for lunch.

Robert Maglia, reached into his back pocket and pulled out his wallet. He then retrieved his Loyola University Maryland identification card from the wallet and handed it to Tim Fox. Tim left the office with Bob's identification card in his hand. When Tim Fox returned to the investigators' office to return Bob's identification card; he entered the office, turned and looked at the Plaintiff, and rolled his eyes. Fox then exited the Investigators' office.

Since allowing anyone who is no longer affiliated with Loyola University; to use a faculty or staff member's Loyola University Maryland issued identification card is a University Policy Violation, the Plaintiff texted Rufus Dawson (Rudy), and, informed him of the fact that Tim Fox was in the building. Rudy was attending a Leadership conference at the

Loyola University Timonium Building during the time that the Plaintiff texted him.  Rudy

immediately called the Plaintiff on her cell phone.  Rudy wanted to know why Tim Fox,

visiting at 5104 York Rd.  Rudy sounded as if he was disturbed by the fact that Tim Fox at

the location, using Robert Maglia's identification card to enter buildings and offices.

49. **On April 13, 2018** at approximately 9:47 a.m., the Plaintiff received a text message from

Rufus Dawson which stated, "Come see me in my office."  The Plaintiff immediately

responded to Rufus Dawson's office prior to attending a scheduled 10:00 a.m. meeting

at the Student Life office.

When the Plaintiff, arrived in Rudy's office; Rudy informed the Plaintiff, that Jocelyn

Kelly had contacted Robert Kelly (Vice President of Loyola University Maryland) and Joan

Flynn and generated a complaint against the Plaintiff.   The complaint was that the

Plaintiff failed to do her job concerning an assault case which occurred off campus.  The

case that was being referred to was reported on March 16, 2018 by Loyola University

student, Miss Ailish Barry (Student I.D. # 1691372).  Miss Barry was assaulted at an Off

Campus location (13 E. Cross Street, Baltimore, Maryland) inside a Pizza Boli's.  She and

her father, Kevin Barry had spoken to someone in the Student Life office prior to

responding to the Investigators' office.  Once the Plaintiff received the information from

the student and her father, the Plaintiff wrote an assault incident report (LUPD Report

#20183016-005386-000053) and contacted Baltimore City Police; and, requested that

an officer respond to 5104 York Rd. to take an assault report (BCPD #9180305787).  The

Plaintiff also conducted a follow-up investigation.  But, According to Rudy, Jocelyn Kelly

told Robert Kelly (Vice President of Loyola University) and Joan Flynn that, Mr. Kevin

Barry was calling the University and complaining that, the Plaintiff (Delsie Parker) did absolutely nothing to help his daughter; and the Plaintiff failed to conduct any type of investigation in the case.

Also, according to Rudy Dawson, Jocelyn Kelly told Robert Kelly and Joan Flynn that, the Plaintiff had written a false report which stated that, on March 21, 2018, the Plaintiff responded to the Pizza Boli's located at 13 E. Cross Street and spoke to Mr. Shakeel Ahmad, the manager.   Also, according to Rudy Dawson, Jocelyn Kelly was pushing for the Plaintiff to be terminated because she thought that the Plaintiff had fabricated the entire report; suggesting that the Plaintiff allegedly wrote a false report.

Rudy Dawson stated Jocelyn Kelly had forwarded the complaint "all the way up the chain" to the Vice President of the University.  Rudy Dawson then told the Plaintiff, that he needed her to write an Administrative Report explaining what she did in the investigation.  The Plaintiff told Rudy Dawson that she had to respond to the Student Life meeting.  Therefore, they could continue the conversation once she returned from the meeting.

Upon returning back to the office at approximately 11:00 a.m., Rufus Dawson, Robert Maglia, and the Plaintiff continued the meeting in Rufus Dawson's office.  Again, Rudy reiterated that Jocelyn Kelly was really pushing for the Plaintiff to be terminated. According to Rudy, Jocelyn told Joan Flynn and Robert Kelly that there was no way the Plaintiff could have responded to the Pizza Boli's on March 21, 2018 or at any time because the University was closed due to bad weather and snow.  Rudy Dawson continuously talked about how serious the accusation was; and he stated, Robert Kelly

39

(Vice President of the University) needed to have the administrative report from the Plaintiff immediately; detailing what the Plaintiff did regarding the case.  And, Robert Kelly also needed the Plaintiff, to give detailed information regarding everyone she spoke to during her investigation.

The Plaintiff (Delsie Parker), asked Rudy, "Why do I need to write an administrative report when I had already written an Incident report detailing my investigation?"   The Plaintiff also reminded Rudy, that the incident occurred off campus at a location that Loyola Campus Police had no jurisdiction over. The Plaintiff also informed Rudy that she wrote the incident report detailing the assault.  And, as a courtesy, the Plaintiff later met with the Manager of the Pizza Boli's to ask if he had a CCTV camera system inside the store which might have captured the incident.  The Plaintiff informed Mr. Barry via an email and over the telephone, that she would forward any additional information to the appropriate Baltimore City Police precinct so that a detective could follow-up on the investigation.

During the Plaintiff's meeting with Rudy and Robert Maglia, Jocelyn Kelly called Rudy on his landline.  Rudy answered the telephone.  Jocelyn was not aware that Bob and the Plaintiff were inside Rudy Dawson's office during the time that she called.   Bob and the Plaintiff could hear Jocelyn through the telephone speaking with Rudy.  Jocelyn sounded very hostile and intense. As soon as Rudy answered the phone, she immediately stated, "Did you go down there to the Pizza Boli's and speak with the manager to find out if she spoke to him?!!!"  At that time, Rudy told Jocelyn, that he had not had time to respond to the Pizza Boli's.

Once the Plaintiff heard the hostility in Jocelyn Kelly's voice, the Plaintiff immediately

stated, "I did speak with the manager of the Pizza Boli's."  When Jocelyn heard the

Plaintiff's response, she immediately disconnected the call.  The Plaintiff immediately

returned to her office and printed out all the e-mail correspondence that had transpired

between her and Mr. Kevin Barry (the victim's father).

Mr. Barry had written the Plaintiff, an e-mail thanking her for all the help that she had

provided to him and his daughter after they reported the assault incident to Loyola

Campus Police and to the Baltimore City Police.

The Plaintiff also provided Rudy Dawson with all the e-mails that she had sent Mr. Barry

and Ailish Barry on 03/22/18, sharing the photographs that she had obtained from the

manager of the Pizza Boli's; depicting the persons who were inside the store just prior to

the assault.  The Plaintiff also provided Rudy Dawson with an e-mail that she sent to Mr.

Barry and his daughter explaining that all pertinent information and material were going

to be forwarded to the Baltimore City Detective Unit.  Also, the Plaintiff provided Mr.

Barry and his daughter with the name and telephone number of the detective who was

going to be handling the investigation.  The Plaintiff then gave Rudy the email that Mr.

Barry had sent her thanking her for helping him and his daughter; and thanking her for

the great work that she did on the case.

Rudy, then told the Plaintiff, to electronically forward all related correspondence, to

include all e-mails, also, all photographs regarding the reported assault case to Robert

Kelly and Joan Flynn immediately.  The Plaintiff forwarded everything that she had on

the assault incident to Robert Kelly and Joan Flynn via e-mail on **04/13/18.**

After the Plaintiff, forwarded all the information regarding the assault to Robert Kelly and Joan Flynn, Rudy met with the Plaintiff again in his office on the same day. Rudy then stated, Jocelyn had changed her story. After the Plaintiff provided such detailed proof of her entire investigation to include the "Thank you letter" that Mr. Barry had sent to the Plaintiff. Jocelyn Kelly then told Vice President, Robert Kelly that it wasn't the father (Kevin Barry) who had called the University to complain about how the Plaintiff had handled the investigation. According to Rudy, Jocelyn then stated, it was Ailish Barry's mother who had called and complained about how the Plaintiff had handled the case. Jocelyn Kelly's entire narrative had changed once the Plaintiff showed proof of all the conversations she had with Mr. Barry and his daughter. The Plaintiff never met Ailish Barry's mother, and, the Plaintiff never conversed or had any type of communication with the complainant's mother.

Rudy then stated, Jocelyn Kelly and Joan Flynn wanted the Plaintiff, to provide an explanation as to why the assault incident was not forwarded to Student Life for review; and Jocelyn Kelly, who also attended the Student Life meeting on 04/13/18, wanted to know why the Plaintiff didn't mention the assault incident at the Student Life meeting. Jocelyn Kelly, also wanted to know why the Plaintiff didn't contact Patrick Kelly (Support Operation Technician); to request that he respond to the Pizza Boli's to retrieve video footage from the computer system.

The Plaintiff informed Rudy, that Jocelyn was responsible for  handling the navigate reporting system; and, Jocelyn would have been the person who would have been

42

responsible for  forwarding the summary of the assault report to Neil Andrito (Director of Student Life) and Daniel Kelly (Assistant Director of Student Life).

 The Plaintiff also informed Rudy that she would not have spoken about the assault that occurred of campus at the weekly Student Life meeting because, Miss Barry was not assaulted by another Loyola University Student; and the assault did not happen on campus. Therefore, Student Life Representatives would not be responsible for adjudicating such an incident that did not occur on Loyola University Campus and/or property. And, that information was something that Jocelyn Kelly should have known, especially since she also attended the Student Life meetings almost every week.

Also, the Plaintiff again informed Rudy that the incident occurred off campus where Loyola University had no jurisdiction.  In order for, Patrick Webber to be able to retrieve information off of Pizza Boli's CCTV camera system, he would have needed to obtain a Search and Seizure Warrant to do so.

Rudy Dawson was able to retrieve all of the summary reports that were sent to him, Neil Andrito and Daniel Kelly (Student Life Representatives) via e-mail, from Jocelyn Kelly during the week of 03/16/18.  He noticed that Jocelyn Kelly had forwarded the aforementioned assault report regarding Ailish Barry to Student Life personnel.

Later that evening, once the Plaintiff returned home, she thought about how far Jocelyn Kelly and Joan Flynn went to say, the Plaintiff failed to do her job.  And, they implied that, the Plaintiff had written a false report; basically, lying about her follow-up investigation.  The Plaintiff also noticed that Jocelyn Kelly and Joan Flynn failed to even

ask, the Plaintiff if she could have typed the incorrect date on the supplemental report; since on <u>March 21, 2018</u>, the university was closed due to inclement weather. Instead, "ironically" the day after Timothy Fox visited both, Jocelyn Kelly and Joan Flynn on the Loyola University Maryland campus; Jocelyn Kelly reached out to the Vice President of the University, Robert Kelly and the Vice President of Public Safety and Parking and Transportation, Joan Flynn; and, attempted to not only assassinate my character, but she also attempted to have me terminated from my position over a case that, the Plaintiff had handled in the month of February 2018.   Honestly, the Plaintiff really do not believe that Mr. or Mrs. Barry was calling the University speaking with Jocelyn Kelly and complaining about how the investigation was handled.  The Plaintiff believed Jocelyn Kelly and Joan Flynn orchestrated a plan of attack in order to attempt to get the Plaintiff terminated from Loyola University Maryland as a form of retaliation and revenge for their close, former colleague and friend, Tim Fox.

Later that evening of **April 13, 2018**, The Plaintiff sent an e-mail to Rudy Dawson, Joan Flynn and Jocelyn Kelly requesting a meeting to discuss the allegations that were lounged against her which questioned the Plaintiff's integrity, and work ethics.  Both, Joan Flynn and Jocelyn Kelly failed to reply to the e-mail request for a meeting.  Rudy Dawson did speak with the Plaintiff and on the following Monday.   Rudy stated, he was working on scheduling a meeting.

50. On **April 19, 2018**, Rudy Dawson, Robert Maglia, Jocelyn Kelly and the Plaintiff met in the Director's Office of Public Safety.  Joan Flynn failed to attend the meeting.  Joan Flynn never responded to the email request that the Plaintiff sent to her inviting her to

the meeting.  But ironically, Joan Flynn and Jocelyn Kelly were the two persons aggressively advocating to have the Plaintiff terminated.

At the time of the meeting, Jocelyn Kelly entered the Director's Office with an apparent attitude.  During the meeting, the Plaintiff asked Jocelyn if she was harboring any ill feelings toward her because of the relationship she had with Timothy Fox. (Jocelyn Kelly and /Timothy Fox were not only colleagues, but allegedly, they had been involved in a sexual relationship for years; even though they both were married). The Plaintiff told Jocelyn Kelly, if she had any problems, now was the time to put everything on the table, especially since the Plaintiff did not work for Jocelyn Kelly.  During the meeting, Jocelyn did not have too much to say.  She stated she had nothing against the Plaintiff personally.  Jocelyn Kelly appeared to be angry and annoyed.  She refused to apologize for her actions.  She spoke to the Plaintiff in a degrading and condescending tone. Jocelyn's arms were crossed as she sat back from the table.  Her face appeared to be tight and "Balled up."  Jocelyn had a look of disgust upon her face.

Shortly after the meeting, the Plaintiff noticed that Jocelyn Kelly began to scrutinize her work even though Jocelyn Kelly was not the Plaintiff's immediate supervisor.   In fact, even before the allegation, Jocelyn was scrutinizing the Plaintiff's work.  For example:

51.  **On March 15, 2018**, the Plaintiff issued a BOLO via e-mail to the Command Staff and officers regarding Ms. Shanae Pittman, a Parkhurst employee who was terminated from her position but threatened to come back to the University and shoot everyone.  In the upper right-hand corner of the BOLO, the Plaintiff accidently put the date of issuance as 03/18/16.  Immediately, Jocelyn Kelly e-mailed me back stating that, the Plaintiff had

the wrong date on the BOLO.  The Plaintiff thanked Jocelyn, changed the date, and also, re-issued the revised BOLO.

52. Then, in **May 2018**, the Plaintiff sent out a spread sheet via e-mail to Student Life representatives.  Also, the Plaintiff carbon copied (cc) the Campus Police Command Staff and Jocelyn Kelly on the e-mail.  The spread sheet detailed the summary of case reports for the week.  The Plaintiff would normally send out a Case Summary Report each week prior to attending the Student Life meeting.  But, that particular week, the last person the Plaintiff carbon copied was, David Optiz; instead of the mid-night Sergeant, David Lease.   The Plaintiff accidently hit one incorrect name when the list of names popped up. Jocelyn Kelly, who had to look through all the name of persons that the Plaintiff "cc'd" on the list, immediately sent the Plaintiff an e-mail stating, "You sent the Case Summary Report to David Optiz instead of David Lease."  At that point, the Plaintiff realized Jocelyn Kelly was going to be scrutinizing everything that she sent out via email that she "cc'd" Jocelyn Kelly on.  Therefore, the Plaintiff made sure to review everything that she sent out diligently and meticulously prior to sending out any e-mails.  And, please be reminded, that the Plaintiff **never** worked under Jocelyn Kelly's supervision. Nor had the Plaintiff ever worked in Access and Control or Communications, which Jocelyn Kelly supervises.  After that incident, things were relatively quiet for a short period of time.

53. Sometime in **May 2018,** the Plaintiff had a meeting with Rudy Dawson in his office. Rudy was extremely upset and emotional.  Rudy Dawson told, the Plaintiff that he had received an e-mail from Tim Fox which he had been accidently carbon copied on.  The e-

mail was directed to Joan Flynn and Kate Grubb, a Caucasian, female (Assistance Vice President of Student Development).  Tim Fox was responding to an e-mail that he had received from Joan Flynn.  In the e-mail, Joan Flynn requested that Tim Fox conduct background investigations on the eight finalist, candidates who applied for the position of Director of Public Safety. Rudy Dawson was one of the Finalist.

Joan Flynn also requested that Tim Fox give his opinion as to who he thought would be the best candidate and fit for the position of Director of Public Safety at Loyola University Maryland.

Also, according to Rudy Dawson, Tim Fox replied to Joan Flynn in the e-mail, that he had already requested that Bob Maglia and Donald Bauer (Baltimore City Police Commander who worked part-time for Loyola University) conduct a background investigation on all eight of the finalist candidates.  Rudy also stated that Tim Fox had listed the names of each the finalist in his email response.  And, although the list included his name (Rudy Dawson), Tim did not include any of his (Rudy's) credentials beside his name.  Tim listed credentials for each of the other candidates.  Also, Tim also suggested which finalist that he thought should get the position.  Tim based his decision upon that fact that the candidate he chose had a background in Law Enforcement and the candidate was an attorney.

When Rudy told, the Plaintiff the names of the finalist/candidates who were listed in the e-mail which Tim Fox sent to him, Joan Flynn, and Kate Grubb.  The Plaintiff immediately told Rudy that she recognized the names on the list.  The Plaintiff told Rudy that she had seen the list of names on Bob Maglia's desk.  Also, the Plaintiff noticed that Bob Maglia

had run a TLO (The Last One) report on each person whose name was listed on the sheet. After, the Plaintiff told Rudy that she had seen the list of names on Bob's desk; Rudy stated he had a meeting with Joan Flynn. In that meeting, he expressed to Joan that he had received a copy of the e-mail that was meant only for her and Kate Grubb. And, he also expressed that he was highly upset and offended that she failed to utilize the proper channels (Human Resources) to have background investigations completed on the candidates who applied for the position of Director of Public Safety. Rudy also told the Plaintiff, that he told Joan Flynn, that he felt that the hiring process had been tainted by her using Tim Fox's input to determine who would be the best candidate for the position of Director of Campus Police. Rudy also said, he informed Joan Flynn that she also tainted the hiring process by allowing Tim Fox, Bob Maglia, and Donald Bauer to conduct the background investigations; especially since Tim Fox demonstrated bias and racist behaviors the entire time that he was the Director of Public Safety at Loyola University. Also, Rudy said on many occasions, he heard Tim Fox say that "A black man would never sit in his seat as Director of Public Safety."

Rudy stated, Joan then apologized to him for all the discriminatory acts that he received at the hands of Timothy Fox and under Tim's leadership. Joan also apologized that he (Rudy) accidently was carbon copied (cc'd) on the e-mail chain.

The Plaintiff mentioned the encounter that Rudy Dawson had with Joan Flynn only to show what a major influence Timothy Fox still had on Joan Flynn (One of his best friends) and others at Loyola University Maryland even after he was forced to retire from his position after years of mistreating African American employees. And, although

Tim Fox was no longer employed by Loyola University (allegedly), his Loyola e-mail account was still active, and, he still had access to privileged information which should have been private.  Tim Fox's influence was still very heavily upon Loyola University.

54. On **July 13, 2018,** the company's Barbeque was held on the lawn of the President's house located at Loyola University Maryland.  At that time, Vice President Robert Kelly told several people that Loyola had offered the position of Director of Public Safety to someone who was an employee from Georgetown University; and that he would be starting his new position soon.

55. On or about **July 30, 2018,** Adrian Black was hired by Loyola University Maryland and he officially began in the position of Director of Public Safety at Loyola University.  Around the same time, Rudy Dawson and Jocelyn Kelly were both promoted from Assistance Directors to Associate Directors of Public Safety.  The Plaintiff remember when she first met Adrian Black.  The Plaintiff was entering the lobby of 5104 York Rd., (the Campus Police/Transportation building).  Rudy Dawson and Director Adrian Black were standing in lobby.  As the Plaintiff entered the lobby, Rudy turned to Adrian Black and said, "Oh, let me introduce you to Delsie Parker, our investigator."  Director Black, looked at the Plaintiff up and down, signed, and then said "Mum, hey."  The Plaintiff extended her hand to shake his hand."  Director Black barely shook the Plaintiff's hand.  Director Black pulled his hand back, then immediately turned his back towards the Plaintiff.  The Plaintiff remembered thinking, "What was that?"

56. On **July 31, 2018**, again Director Black and the Plaintiff crossed paths in the lobby.  The person whom Director Black was with, former Campus Police Officer Leitha Jefferson,

asked him, "Oh, have you met Delsie." Director Black looked at the Plaintiff; tighten his

lips together, and, put his head up high before he replied in a dispersing tone, "I already

met her!" Again, the Plaintiff's reaction and immediate thought was, "What was that?"

57. On **August 1st, 2018** at 8:00 a.m., the Command Staff meeting was held in the

conference room.   Director Adrian Black conducted the Staff meeting.   During the

meeting, he spoke about the short range objectives, mid-range goals and long-term

goals that he had for the Campus Police Department.   The meeting lasted for over two

hours.   Also, during the meeting, Director Black stated that he wanted the opportunity

to meet with all the officers, investigators, Sergeants and Lieutenants in a one-on-one

meeting.   He stated Rose Devon (the Administrative Assistance) would be scheduling at

least 30 minutes, appointments for everyone.   Rose scheduled, the Plaintiff's meeting

with Adrian Black for August 09, 2018.

58. **August 09, 2018,** Director Black and the Plaintiff met in the conference room at 5104

York Rd.   At that time, Director Black expressed that he was hired as the Director of

Campus Police to come in and make changes.   He stated his directives were coming

from the "very top."   He also stated that he was told that the former Director was asked

to retire from his position due to bad circumstances.   Adrian then asked the Plaintiff,

what was going on in the Campus Police Department according to her perceptive.   The

Plaintiff informed Director Black that the Campus Police department did have a lot of

leadership issues.   Also, the Plaintiff informed Director Black that Tim Fox's effect on the

department was still lingering.   The Plaintiff also informed Director Black that he would

have to observe for himself to formulate his own opinion as to what was happening

within the department.  Director Black and the Plaintiff's initial meeting lasted

approximately ten minutes.  Immediately after the meeting, Director Black came into

the investigators' office on many different occasions.  Each time that Director Black

entered the Investigators' office, he said to the Plaintiff, "You look like you don't have

enough room in here." Or, he would say, "You look like you are squeezed in that

corner."  Director Black continuously suggested that the Plaintiff move out of the

Investigators' office; and move into another space.  The Plaintiff told Director Black that

she was fine and that she had more than enough space in the office. For the most part,

everything seemed to be moving along fine until Director Black requested to meet with

the Plaintiff in his office for a 2nd meeting in October 2018.

59. On **October 11, 2018**, three campus police officers: P/O Darlene Wing, Joseph Williams,

a Caucasian male,  and David Butkiewicz, a Caucasian, male, and the Plaintiff, were all

scheduled to attend a BRAVE (Bring Respect and Advocacy for Violence-free

Environments) training that was held at McDaniel College from 10:00 a.m. – 4:00 p.m.

We all signed up for the conference months in advance.  Unfortunately, the Plaintiff was

extremely sick on day of the conference.  Therefore, the Plaintiff could not attend the

conference.  Officers Wing, Williams and Butkiewicz were all told that they could not

attend the conference due to a shortage in manpower on the 4x12 shift.

On the same morning, at approximately 9:50 a.m., the Plaintiff received a text message

from Rudy Dawson stating, "Good Morning, see your email message from the director."

The Plaintiff then checked her email.  The Plaintiff received an email from Rudy Dawson,

in which he stated that he was advised by Director Black; due to the fact that Bob

Maglia was off; the Plaintiff needed to discontinue the BRAVE training, and, return to

5104 York Rd. as soon as possible.   The Plaintiff informed Rudy Dawson that she did not

attend the training due to the fact that she had already called out sick.

60.  **October 12, 2018,** the Plaintiff returned to work.  During the afternoon hours, Director

Adrian Black came into the Investigators' office and requested that, the Plaintiff meet

with him in his office.  Once they were in his office, Director Black asked the Plaintiff,

how did Officers Wing, Williams, and Butkiewicz receive information regarding the

BRAVE training? The Plaintiff informed Director Black that she had attended the 1st

BRAVE training on August 10, 2018 which was held at Stevenson University. The Plaintiff

also told Director Black that Officer Da'mon Wood was the only Loyola University

Campus Police Officer who had attended the training that day.  When Katsura Kurita

(Title IX deputy of Loyola University) sent out the information regarding the training via

e-mail, the Plaintiff forwarded the information to all campus police officers because the

training was free.  And, prior to doing so; Rudy Dawson, told the Plaintiff that he had

told John Goods (Lieutenant for the 4x12 shift) to send the information regarding the

BRAVE training out to all the Campus Police Officers.   Unfortunately, Lieutenant Goods

neglected to send out the information.

After Director Black and the Plaintiff discussed the information regarding the email

which she forwarded to the patrol officers regarding the BRAVE training;  Adrian then

asked, the Plaintiff if she had a wish list; want would she like to see happen in the Public

Safety Department.  The Plaintiff told Director Black that she would like to see more

officers get promoted.  The Plaintiff explained to Director Black how officers are used to

act as "Officers in Charge/OICs" for long periods of time.  Then, the University later hires

persons who were not initially affiliated with the university to fill the supervisors'

positions.

At that time, Director Black asked the Plaintiff if she would like to have her own office.

The Plaintiff told Director Black that she was fine in the office that she was in.  Director

Black then stated he heard that Bob and the Plaintiff did not get along.  The Plaintiff

then told Director Black, that she and Bob did not get along when Tim Fox was the

Director.  The Plaintiff also told Director Black, when Tim Fox was at Loyola University,

he and Bob were constantly plotting to get her fired.  Additional, Tim Fox never held Bob

accountable to do any work in the Investigators' office.

 The Plaintiff also stated that since Tim Fox had left the university, Bob was finally doing

a small amount of work.  The Plaintiff explained to Director Black the benefits of

working in the same office with Bob Maglia.  The Plaintiff told Director Black that she

and Bob needed to be close so that he and she could discuss the cases that we were

being investigated.  The Plaintiff also told Director Black that she would think about his

offer to move into her own office; and also, she would get back to him.

As the meeting was about to end, Director Black then said, "Oh, by the way; I received a

complaint about you.  Jocelyn Kelly came to me and complained that you were

unprofessional in a Student Life meeting.  She said you argued with her about a Clery

matter."  The Plaintiff, informed Director Black that she never argued with Jocelyn Kelly

about a Clery matter in a meeting nor was she ever unprofessional in any meeting."

Director Black then stated, "I know. I already conducted my own investigation. I called everyone who was in the meeting, Neil Andrito (Director of Student Life) and Daniel Kelly (Assistant Director of Student Life); they both said the same thing that you said. They both said that there was never an argument between Jocelyn and you.   And, they all said that you were never unprofessional." Director Black then stated, "I wonder why Jocelyn would bring this to me if it never happened."   Director Black said Jocelyn's complaint against the Plaintiff, bothered him.

The Plaintiff then told Director Black that Jocelyn had a personal dislike for her. The Plaintiff also informed Director Black about the accusation that Jocelyn Kelly and Joan Flynn had alleged against her in April of 2018; regarding the Off Campus assault, investigation that she handled. The Plaintiff also told Director Black, that she had recently reached out to Jocelyn about receiving her State NLET meters clearance. Jocelyn ignored the Plaintiff's email. And, when the Plaintiff called Jocelyn in her office, Jocelyn told the Plaintiff via telephone that the State Police did not have a file on her. On the same day, The Plaintiff spoke to Rudy Dawson about her State NLET clearance for Meters. Rudy Dawson, informed the Plaintiff, that the State Police investigator called him in July of 2018 to verify that the Plaintiff worked at Loyola University so that he could issue her clearance information. Rudy said he referred the call to Jocelyn Kelly since she was the point person for the Meters clearance information. The Plaintiff told Director Black that she again emailed Jocelyn about the Meters clearance information; and, the Plaintiff carbon copied (cc'd) him Director Black on the email. Jocelyn still did not send a response to the Plaintiff's email.

After the Plaintiff shared the aforementioned information with Director Black, he asked Rudy Dawson to join the meeting. Rudy verified everything that The Plaintiff had told Director Black during the meeting.  The Plaintiff also told Director Black that she felt like she was being harassed by Jocelyn Kelly and something needed to be done.

Director Black then stated he was going to talk to Jocelyn Kelly about her accusation. And, Director Black told the Plaintiff, that he would follow-up with her at another time about the matter.  Later, on the evening of October 12, 2018, The Plaintiff sent Director Black an e-mail following up concerning our earlier meeting that day.

61. On October 18, 2018, Director Black requested that the Plaintiff meet with him in his office.  At that time, he told the Plaintiff that he wanted everything that she had regarding the accusation that Jocelyn Kelly had reported to Joan Flynn and Robert Kelly in April 2018 regarding the assault investigation that she had handled.  The Plaintiff then showed Adrian the Assault Incident Report, photos and emails that she received related to the reported incident.  The Plaintiff also showed Director Black the follow-up email that was dated April 13, 2018; that she sent to Rudy Dawson, Jocelyn Kelly and Joan Flynn requesting a meeting.  Director Black then asked the Plaintiff, if Joan ever replied to the email request for a meeting.  The Plaintiff replied, "Joan never replied." Director Black then asked the Plaintiff if she had any additional information.

The Plaintiff told Director Black that she also noticed prior to and following the allegation, that Jocelyn had started to scrutinize her work; to include BOLO's and emails that she sent out.   Director Black asked the Plaintiff if she still had a copy of the BOLO. The Plaintiff gave Director Black a copy of the BOLO that was dated 03/15/18 regarding

55

a former Parkhurst employee, Shanae Pittman, along with the email that Jocelyn sent to her. The Plaintiff also, gave Director Black a copy of the email that Jocelyn sent to her regarding a Case Summary report the Plaintiff sent out to the Command Staff; and accidently carbon copied, David Optiz on the email; instead of Dave Lease. The Plaintiff carbon copied, David Optiz last out of a list of at least ten people who were carbon copied. That meant, Jocelyn carefully reviewed the list of persons whom the Plaintiff carbon copied on an email.

Director Black then asked the Plaintiff if she had any additional information on Jocelyn Kelly. Director Black told the Plaintiff to give him everything that she had. Director Black stated he was going to "Hit Jocelyn hard" because Jocelyn was giving him push back on the Campus Police budget. Director Black also stated he was having problems with Jocelyn because she argued with him about the fact that he had placed hidden microphones in the Roll Call room without informing the Officers or anyone else that the microphones were hidden in the ceiling. And, if anyone conducted any type of business in the roll call room, they would be recorded without their knowledge. Director Black also stated, Jocelyn told him that he could not record people without letting them know that they were being recorded. Director Black also stated that he could do what he wanted to do; and that he had to tell Jocelyn that she was not the Director of Public Safety. Then, Adrian asked the Plaintiff; why did she, the Plaintiff think that Timothy Fox gave Jocelyn so much power when he was the Director of Public Safety. The Plaintiff told Director Black, that she knew that; Tim Fox favored Jocelyn Kelly when he was the Director of Public Safety. The Plaintiff also said, that Jocelyn was

56

"Tim's right arm" sort of speak.  The Plaintiff also told Director Black that Tim's

relationship with Jocelyn caused problems for each Assistant Director of Public Safety

that was at Loyola University since the Plaintiff had been employed with Loyola

University.

Director Black then asked the Plaintiff, what type of relationship did Tim and Jocelyn

have.  The Plaintiff answered by saying, all that she knew was that they had a close

working relationship.  Director Black then stated, he heard that they had more than a

working relationship.  Director Black suggested that Tim Fox and Jocelyn Kelly had a

sexual relationship.  The Plaintiff told Director Black that she did not know anything

about that.  Also, The Plaintiff told Director Black that she did not have any additional

information on Jocelyn Kelly.

Director Black again stated he was going to "hit Jocelyn hard."  And, he did not like the

fact that Jocelyn Kelly thought that she was the Director of Public Safety.  Director Black,

continued, and said that he was planning to meet with Jocelyn Kelly and Joan Flynn later

on that same day, or sometime the next day.  Director Black was about to conclude the

meeting but then asked the Plaintiff another question.

 Director Black asked the Plaintiff if she could remember the date that Tim Fox came

back to visit Loyola University.  At first, the Plaintiff did not remember the exact date.

Then, the Plaintiff remembered that she sent Rudy Dawson a text message during the

time that Tim Fox was in the office.  The Plaintiff retrieved her cell phone; and, The

Plaintiff was able to locate the text message that she had sent to Rudy on the day that

Tim Fox visited the university.  The date that the Plaintiff sent Rudy Dawson the text

message that Tim Fox was in the office was **April 12, 2018**.  The Plaintiff showed the text message to Director Black.

Director Black then asked the Plaintiff if she remembered who Tim Fox came to see. The Plaintiff told Director Black that Tim Fox had come to see Joan Flynn and Jocelyn Kelly.  The Plaintiff remembered that Tim Fox told Bob Maglia to give him his swipe card, Tim stated, "I'm going up to see Joanie and Jocelyn."  After the Plaintiff said that, Director Black's mouth opened wide as if he was in shock.  Director Black had a look of disgust upon his face.  Director Black then stated, "Joanie, he calls her Joanie!"  Adrian appeared to be somewhat upset and saddened.

The Plaintiff told Director Black that she specifically remembered who Tim was going to visit because when Tim asked for Bob's swipe card, the Plaintiff's first thought was; why does he need Bob's swipe card when the campus is opened during the day time.  All the exterior doors are unlocked. .  And, during answering Director Black's questions, it was during that time that the Plaintiff remembered that it was the next day, **April 13, 2018,** that Jocelyn Kelly and Joan Flynn accused the Plaintiff of insubordination (failure to do her job) regarding the assault that occurred off campus, at the Pizza Boli's.  Both Joan Flynn and Jocelyn Kelly went to the Vice President of the University, Robert Kelly and requested that the Plaintiff be terminated. Director Black continued and stated, that was all the information that he needed.  He then concluded the meeting.

62. On **October 19, 2018,** the Plaintiff met with Rufus Dawson in his office.  Rudy Dawson, told the Plaintiff, that Director Black had met with Jocelyn Kelly and Joan Flynn about Jocelyn reporting a false complaint against the Plaintiff.  Rudy stated Jocelyn left the

meeting extremely upset.  Rudy also said, Jocelyn came into his office after the meeting; and she told him that she was about take a week off and go on a liquid diet.  When the Plaintiff asked Rudy, what did that mean; Rudy, started laughing and stated, Jocelyn said she was going to go home and, she was going to drink alcohol for the weekend.  The week of October 22 – 26, Jocelyn Kelly did was not at work.  Once again, things seemed to be moving along fine.

63. Then on **December 18, 2018**, Timothy Fox returned to the office of 5104 York Rd.  Not only did Tim Fox return to the office, but he was using a Loyola University swipe card again to enter locked doors, and also, areas that are only allowed for employed personnel.  The Plaintiff texted Rudy Dawson at approximately 2:54 p.m., regarding the Christmas Party that we planned to have for the unit on Dec. 19, 2018.  Rudy texted the Plaintiff back that he had already left for the day.  The Plaintiff then called Rudy on his cell phone to speak with him.  When the Plaintiff spoke with Rudy via cell phone, the Plaintiff could hear in Rudy's voice tone that he was extremely upset.  According to Rudy, Tim Fox was visiting 5104 York Rd. and, he was walking around like he was still the Director of Public Safety.  Also, Rudy stated, that he was so bothered by the presence of Tim Fox; that he left early for the day.

64. The next day, **December 19, 2018**, the Plaintiff was conducting CCTV camera review for a case that she was working on.  While conducting the review, she noticed that the camera had captured Tim Fox on Dec. 18, 2019 inside the Public Safety Building (5104 York Rd.)  Timothy Fox was on camera reaching into his rear pocket, pulling out a wallet.  Tim then opened the wallet and pulled a card like object.  He then pulled the card out of

a protective sleeve, and used the card to swipe into the mailroom at 5104 York Rd.  Tim

Fox was also captured on CCTV using the same card to enter other locked doors within

the building. And, he was captured on video having lunch with Bob Maglia and spending

a large amount of time in the investigators' office before he left the building.  The

Plaintiff made a video capturing Tim Foxing using the swipe card.  Also, the Plaintiff

printed out pictures of Tim Fox using the swipe card and entering the Investigators'

office and Mail room.

65. On **January 25, 2019**, Tim Fox again returned to 5104 York Rd.  Fox entered the

investigators' office with Robert Maglia.  Again, Tim was captured on CCTV video using a

swipe card to enter the building and to open other locked doors throughout the

building.  Fox also entered Sergeant Stephen Konarski' s office and Lt. Dennis

Thompson's office and spoke to them.  As the Plaintiff was about to leave to go home

for the day, she walked over to Rudy Dawson's office.  Although Rudy's office door was

completely opened; Rudy was not inside his office.  The Plaintiff then called Rudy on his

cell phone. When Rudy answered the phone, the Plaintiff asked Rudy if he knew that

Tim Fox was at 5104 York Rd.  Rudy answered, "Yes, I saw him walking around in there

like he owned the building."  Rudy said he and John (referring to Lieutenant John Goods)

were just on the phone talking about Tim Fox."  Rudy then stated he left the building

because seeing Tim upset him.

At that time, it was approximately 4:30 p.m.  The Plaintiff then left the building to go

home.  The Plaintiff moved my personal car to the rear parking lot of 5104 York Rd. The

Plaintiff noticed that Tim Fox's silver colored Nissan Murano was also parked in the rear

of 5104 York Rd. about three spaces down from where the Plaintiff parked her vehicle. The Plaintiff had backed her vehicle into the parking space. The rear bumper of the Plaintiff's vehicle was touching the wall. The Plaintiff's, purchased Loyola University Maryland parking permit (#51033) was hanging from the rear view mirror. The Plaintiff parked her personal vehicle on the parking lot of 5104 York Rd. because she had rented a vehicle from the Enterprise Rental Car so that I could drive out of town for the weekend.

66. On **January 27, 2019** at approximately 10:30 a.m., several campus police officers who were working the (8x4 shift) contacted the Plaintiff via her cell phone and stated, Lieutenant Denise Thompson (a Caucasian female) had placed an $85.00 ticket on the Plaintiff's vehicle. The officers also told the Plaintiff, that after Denise Thompson placed the Loyola University ticket on the vehicle, she notified Baltimore City Police. Once a Baltimore City Police officer responded to the location, Thompson requested that the responding officer tow the Plaintiff's vehicle off the lot. The Baltimore City Police officer refused to tow the Plaintiff's vehicle, due to the fact, that the parking lot at 5104 York Rd. was a private parking for the Loyola University. Each campus police officer who called the Plaintiff regarding Denise Thompson's actions that day stated that Lt. Thompson called everyone else by telephone who did not have a parking permit or who had an unregistered vehicle parked on the parking lot of 5104 York Rd, and told those persons to come and move their vehicles. And, Lieutenant Thompson never placed a ticket on those vehicles.

61

Denise Thompson never called the Plaintiff. According to the three officers who called the Plaintiff, they all stated what Denise did was a personal act against the Plaintiff. The Officers also stated that Denise Thompson knew that the parked vehicle belonged to the Plaintiff prior to her placing the ticket on the vehicle; and prior to her notifying Baltimore City Police to request that my vehicle be towed off of the parking lot. All the officers contended that Thompson's actions were malicious.

67. On **January 29, 2019**, when the Plaintiff returned to work; she met with Director Adrian Black. At that time, the Plaintiff and Director Black discussed the fact that Timothy Fox had once again visited 5104 York Rd., on January 25, 2019. Also, Tim was once again using a swipe card. Adrian stated, "Yes, I saw him. I was giving another director a tour of the building when Tim almost ran into me as he was coming out of Sgt. Konarski's office. I almost did not recognize him. He was wearing a little vest." Then Adrian asked, "Why does he keep coming back here? Based upon the circumstances in which he was asked to leave, he should not be permitted to come back here whenever he wants to. And, there were so many EEOC complaints filed against him."
The Plaintiff then told Director Black, that she had the same concerns. Especially since, the Plaintiff was one of the persons who filed an EEOC complaint against Tim Fox. The Plaintiff did not have a problem with Tim Fox visiting his friends, but the Plaintiff was more concerned that Tim Fox was given a swipe card to enter the building, and to maneuver his way throughout the building. The Plaintiff also informed Director Black that she also knew that Rudy Dawson and John Goods were both upset by Tim Fox's visit to the Campus Police Building. The Plaintiff told Director Black, that she had spoken to

Rudy via cell phone on <u>Friday, Jan. 25, 2019</u>, and he was extremely upset that Tim Fox was in the building.  Director Black then stated, "Wow, Rudy left early that day.  He was not supposed to leave early."  Director Black then asked the Plaintiff, if she thought Rudy left work early because Tim Fox was in the building."  The Plaintiff told Director Black that she did not know. Then Director Black asked the Plaintiff, "Who is Tim coming to see?" The Plaintiff responded to Director Black's question by stating, Tim came back to visit Bob and his other friends.  The Plaintiff also stated, Tim had swipe access to enter the building. The Plaintiff told Adrian that she had taken snap shots using the computer, of Tim using the swipe card.  Director Black immediately appeared to get upset.  He stated, "I don't understand why he continues to come back here.  When I left Georgetown, I could not just go back there just to be going back. I had to turn in my swipe card and my identification card."  Director Black then stated," Give me all the photographs that you have of Tim Fox using the swipe card.  Then Director Black stated, in fact, I'm ordering you to give me everything that you have."

Once the Plaintiff retrieved the photographs which depicted Tim Fox inside of 5104 York Rd. using a swipe card, she gave the photographs to Director Black.  Director Black then asked the Plaintiff, if she had conducted a swipe history report to see if the swipe card belonged to Tim.  The Plaintiff told Adrian that she did not conduct a swipe history search.  Director Black then ordered the Plaintiff to run a swipe history report to ascertain who the swipe card belonged to.  Director Black then stated, he was going to meet with, Joan Flynn; but he wanted, the Plaintiff to send the swipe history report to him via email immediately once she conducted the search.  Director Black told the

Plaintiff that he was on his way to meet with Joan Flynn so that he could have Timothy

Fox banned from coming to 5104 York Rd.  Director Black stood up and walked out of his

office.  He appeared to be extremely upset.

When the Plaintiff returned to her office, she completed a swipe history search for the

mail room door on December 18, 2018 between the hours of 1315 hrs. – 1330 hrs.  (The

time that Tim Fox was captured o CCTV entering into the mailroom).  According to the

report, access was granted to Robert Maglia at that exact time.  Therefore, Timothy Fox

was using a Loyola University Maryland Identification card in the name of Robert Maglia

for a 2nd and 3rd time.  The Plaintiff then forwarded a copy of the Swipe History report

to Director Black via e-mail.

Also, on **January 29, 2018** at approximately 1630 hrs. as the Plaintiff was leaving work

for the day; she walked to her vehicle that was parked in the rear of 5104 York Rd.  It

was at that time, that she noticed the Loyola University Traffic Citation (No. A 075902

dated 01/27/19) that Denise Thompson had placed on my vehicle.  The Plaintiff had

forgotten all about the fact that the officers called her; and informed her that Denise

Thompson had placed the ticket on her personal vehicle.

68. On **January 30, 2019**, when the Plaintiff returned to work, she spoke to Rudy Dawson

about the fact that Denise had placed an $85.00 ticket on her personal vehicle.  The

Plaintiff informed Rudy that she also knew that Denise had contacted Baltimore City

Police and requested that an officer respond to 5104 York Rd.  And, once the officer

responded to the location, she asked the officer to tow the vehicle off the parking lot.

As the Plaintiff was speaking about the incident to Rudy, he immediately placed a smirk upon his face.  Rudy then responded by saying, "Oh yeah, Denise called me and the Director and told us that she placed a ticket on your personal vehicle; and, that she tried to get the car towed." Rudy then stated, Denise reported you to the Director.  Rudy seemed to have found the situation to be amusing or funny.

Later, on the same day Joan Flynn came to the Investigators' office after she left Director Black's office. The Plaintiff was seated at her desk.   Joan Flynn said that she just stopped by to speak to Bob.  Bob was not at his desk.  Joan said hello to the Plaintiff. The Plaintiff said hello to Joan and continued to work on a report.  As Joan turned to walk away from the entrance of the office door, she looked back at the Plaintiff with a look of anger and distain upon her face.  The Plaintiff had lifted her head; and, looked up at Joan, just in time to catch the look upon Joan's face as she stared at the Plaintiff.  Joan then immediately walked away from the door without saying a word.  The Plaintiff assumed that Adrian had already spoken to her about Tim Fox visiting the office; and, requested that Tim Fox be banned from coming to 5104 York Rd.

69. On **February 05, 2019**, at 10:00 a.m. the Command Staff Meeting was held in the conference room at 5104 York Rd.  Joan Flynn attended the meeting.  Joan opened the meeting by thanking everyone in campus police for all that they do for the university.  She continued the meeting by stating that Tim Fox brought the Campus Police Department a long way during his sixteen years tenure with Loyola.  And she also stated, Adrian Black will be moving the department in a new direction.

Joan also, said that she noticed that some of us in the Public Safety Dept. addressed Adrian as Colonel, some addressed him as Director, and some addressed him as Director Black. Joan stated we will not address Adrian Black as Colonel because only Tim Fox earned that title. Joan then stated we will not refer to Adrian as Director or Mr. Black. She stated we are to simply call him by his first name, Adrian. Joan also said, in her office everyone calls her by her first name. Adrian was sitting in the back of the room. He never said anything about how his Command Staff and officers should address him. Joan then discussed some of the changes that were going to be made for the campus police officers. She talked about how the officers would no longer be required to transport students off campus to take them to their Off Campus housing. Both, Joan and Adrian spoke about how the Campus Police Commission only allows campus police to have jurisdiction on Loyola University campuses.

The Plaintiff then asked the question, "Will campus police still be given dispatched calls to respond to surrounding neighborhoods for parking complaints off campus?" Although Joan addressed the Plaintiff's question, she seemed to be very annoyed and angered by the question. Joan stated, "Delsie Parker, we are Loyola University, if the officers want to work for us, they will respond to investigate the vehicles. Loyola formed a coalition with the surrounding Rolland Park neighborhoods when the Ridgely Athletic Stadium was built." Then Joan asked, "How hard is it to go to a neighborhood, and look at a car to get a tag?" The Plaintiff had never heard Joan address her by her full name before. The Plaintiff could tell by Joan's tone that she was upset and irritated by my question. Director Black was seated to the right of the Plaintiff. Director Black

was tapping the Plaintiff on the elbow, signaling her to stop talking as Joan seemed to grow even more annoyed that others in the meeting agreed with the Plaintiff.

70. Then **on February 07, 2019,** at approximately 1:30 p.m., Rudy Dawson came to the door of the Investigators' office and told Bob Maglia that Adrian wanted to meet with him in his office.  Bob immediately got up from his desk and followed Rudy to Adrian's office.  After about 20 minutes, Bob re-entered the investigators' office.  Bob's face was completely red in color as he appeared to be upset.  Bob then turned to the Plaintiff, and said, Adrian wants to see you in his office. The Plaintiff walked over to Director Black's office and knocked on the door.  When, the Plaintiff entered the office, the first thing that Director Black said to her was, "Do you have anything to tell me?"  The Plaintiff immediately said the temporary tags on her personal vehicle were expired.  The Plaintiff explained to Director Black that MVA refused to release her tags until she paid a $5000 fee for a vehicle that was totaled in an accident over fifteen years ago.  The Plaintiff also explained to Director Black that due to the fact that she had been paying almost $2000 a month for child support for the last seven years, she could not afford to pay the $5000 fee to purchase the tags at that time.

The Plaintiff also told Director Black, that her son had been placed back in her care and custody in August of 2018, and the child support payments had stopped, she would be able to pay the MVA fee to purchase the tags for my vehicle before the end of the month.  Director Black then asked the Plaintiff, how much would the ticket violation be if she got stopped by the police?  The Plaintiff told Director Black that she did not know.  Director Black then asked the Plaintiff, "How much money did she have saved already."

The Plaintiff told Director Black, that the question was a bit too personal. The Plaintiff did not answer the question. Director Black then stated, "Well I wanted to see if I could help you in some way." The Plaintiff then thanked Director Black but assured him that she was okay; and she would be able to pay the MVA fee by the end of the month to get her new tags. At that time, the Plaintiff told Director Black that she had purchased a Loyola parking permit for her vehicle back in September of 2018. The Plaintiff also told Director Black that the parking permit was hanging on the rear- view mirror of her vehicle when Denise Thompson placed the ticket on the vehicle.

The Plaintiff also informed Director Black, that the reason she left her vehicle parked on the parking lot of 5104 York Rd. as she had done on prior occasions; was because she had rented a car from Enterprise which was located in the 5100-blk of York Rd. The Plaintiff drove the rented vehicle to Atlanta, Georgia to visit my sister. The Plaintiff also explained to Director Black that she left town due to an emergency situation. The Plaintiff informed Director Black that her only sister was severely injured in a house that exploded on Christmas Eve. Three people who were in the house with her sister when the house exploded died. The Plaintiff's sister was the only person who was in the house that survived. The Plaintiff's sister sustained 3rd and 4th degree burns all over her body and was in a comma. The Plaintiff's sister was flown to a burn hospital in Augusta, Georgia immediately after the incident.

After, the Plaintiff told Director Black the aforementioned information, the Plaintiff noticed that the right side of Director's Black top lip curled upward in a half smile position. He then chuckled and said, "Yeah, Denise put the ticket on your car because I

sent out an email last week about the parking permits." Director Black then stated,

several people noticed that your tags were expired.  Director Black also told the Plaintiff

not to park her vehicle on the lot at 5104 York Rd.  Director Black then asked the

Plaintiff if she could just park her vehicle on the CVS parking lot.  The Plaintiff told

Director Black that she would not feel comfortable parking her vehicle on the CVS lot

with expired tags. The Plaintiff, then told Director Black that she would not park her

vehicle on the lot at 5104 York Rd.  The Plaintiff told Director Black, that she would

either take the subway to work; or she would park her vehicle on a public street.

Director Black then immediately replied, "No, I do not want you to take the subway to

work, that might be too far for you to walk."  Then he asked the Plaintiff, "Are you

talking about the subway station that's down by the University of Baltimore?"

The Plaintiff told Director Black, "No."

The Plaintiff explained to Dr. Black that there was a Subway Train station located on

Coldspring Lane.  And, that she could take the subway from Owings Mills to the

Coldspring Lane station.  Adrian then replied, "No, I don't want you to do that.  It is too

cold for you to take the subway.  Just find somewhere else to park your vehicle."

Director Black also stated, "You have been put on notice."  He then told the Plaintiff not

to tell anyone that Denise put a ticket on her personal vehicle.  The Plaintiff thought that

the Director telling her not to tell anyone about the ticket was odd. As the Plaintiff was

about to exit the Director's office, Adrian said to her. "Oh, by the way; I spoke to Bob

about giving Tim Fox his swipe card.  Tim Fox will not be coming here anymore.  I took

care of that."

When the Plaintiff exited Director Black's office, Rudy Dawson asked her to come into his office. At that time, Rudy, told the Plaintiff that he sat in on the meeting that Adrian had with Bob Maglia, prior to the Plaintiff's meeting with Director Black. According to Rudy, Bob wrote an administrative report in which he stated that he did not give his swipe card to Tim Fox after Director Black had already spoken to him the first time about him allowing Tim to use his swipe card. Rudy stated, Adrian then showed Bob the photographs of Tim Fox using the swipe card again. Rudy also stated Adrian also showed Bob the swipe history report which showed that the card belonged to him. At that point, according to Rudy; Bob threw his hands up in the air and stated, "Okay, you got me. I lied. I did let Tim use the card again."

Rudy stated, Adrian was trying to decide if he was going to charge Bob for writing a false report; and for violating the University Policy for a third time allowing Tim Fox to use his swipe card. Rudy then stated, "Yeah, I left early on the day that Tim was here. I didn't want to see Tim after all the trouble he caused when he was here; and even, after he left."

When the Plaintiff returned to her office, she noticed that Bob was still apparently very upset. Bob Maglia then grabbed the vehicle keys to "960" departmental car and stated, "I've got to get out of here." Bob then stormed out of the office. Bob had already been gone for hours when Rudy came into the Investigators' office and asked if Bob had gotten back. The Plaintiff told Rudy that Bob had not returned. Rudy stated that he thought that Bob was not going to come back to work. He said, Bob was so very upset in the meeting that he thought that Bob would probably retire from his position. The

Plaintiff told Rudy that Bob would be back because he took the departmental vehicle when he left.  At approximately 4:30 p.m., Bob returned to the office just before it was time for him to get off work.

71. Later, on the evening of **Feb. 07, 2019**, the Plaintiff sent Director Black a follow-up email regarding their meeting.  In the email, the Plaintiff thanked Director Black for asking her how he could be a help to her regarding purchasing her new tags.  After <u>Feb. 07, 2019</u>, the Plaintiff <u>never</u> parked her personal vehicle on the parking lot of 5104 York Rd again. On days that it was not too cold, the Plaintiff took the subway to work.  On other days when the weather was extremely bad, the Plaintiff drove to work and parked her personal vehicle in the 400-blk of Notre Dame Lane.   Loyola has numerous CCTV cameras in the 400-blk – 600 blk. of Notre Dame Lane.  The upgraded digital cameras where placed outside of the Rahner Village Apartments, Aquinas Hall  apartments, and all along the 400-600 block corridor of Notre Dame Lane due to the fact that a Loyola University Maryland student was carjacked in the 400-blk of Notre Dame Lane on 10/04/17 (report #20171004-005363-000036).  The Plaintiff's personal vehicle could clearly be seen on the CCTV camera whenever she parked the car on the public street in the 400-blk of Notre Dame Lane.  And, the Plaintiff knew Director Black knew which vehicle belonged to the Plaintiff because, when she did park her vehicle on the lot of 5104 York Rd. prior to February 07, 2019, Director Black use to park his personal vehicle, a black, Ford Explorer, SUV directly behind the Plaintiff's personal car.

72. On **February 11, 2019,** the university opened at 10:00 a.m. due to inclement weather. When the Plaintiff arrived at work, she noticed that Director Black had sent an email to

Rudy Dawson and her stating that he needed follow up information on a case that Bob

Maglia was supposed to had completed prior to him going on vacation.  The

investigation was regarding a complaint that was made by a student against Campus

Police Officer Keiosha Wyche, an African American, female.  The complaint was made in

December of 2018.  Senior Investigator, Bob Maglia, still had not completed the

investigation.  Bob was scheduled to be on vacation until 02/15/19.  He was scheduled

to return to work on 02/18/19.  Director Black stated, he told Bob to close or to

complete the investigation prior to him going on vacation.  The email that Director Black

sent to Rudy and the Plaintiff stated that he needed to have the investigation completed

by the end of the week.

After Director Black returned from the scheduled Student Life meeting, he requested

that the Plaintiff meet with him in his office.  When the Plaintiff arrived in Director

Black's office, the Plaintiff noticed that Director Black appeared to be frustrated.

Director Black, told the Plaintiff that he needed her to work on the investigation of the

complaint that was made by a female student (name unknown) who alleged that in

December 2018, Officer Keiosha Wyche transported her and a male student (Nicholas

Perrotta) across campus.  The student alleged, after the transport was completed,

Officer Wyche told them that they would be charged $25.00 for the transport.  And,

every time they called campus police and requested a transport in the past, they were

charged a fee of $25.00 that was added to their tuition fees.

Director Black told the Plaintiff that he was tired of getting "chewed out" and "taking

hits" from Joan Flynn and Student Life representatives because of Bob's incompetence.

He also stated, Bob was making the investigators' office and him look bad. Director Black showed the Plaintiff the Statement which Bob had turned in after he interviewed the female complainant who filed the complaint against Officer Wyche. It was a one page statement that was typed in a 16 font, and, doubled spaced. Director Black held the paper in his hand and stated, "This is not an interview. I don't know what this is. This is nothing." Director Black then asked the Plaintiff if Bob took notes when he conducted interviews.

Director Black then asked that the Plaintiff contact the 2nd student in the case, Mr. Nicholas Perrotta to get a statement from him. At that time, The Plaintiff reminded Director Black that Dave TIscione (Director of Student Conduct) had also sent her an email requesting that that she listen to Bob's recorded interview statements that he conducted with students, Cairo Haynes and Antonio Banks regarding four reported thefts that occurred on campus. Dave Tiscione asked the Plaintiff to transcribe the interviews so that he could gather more information since Bob failed to submit adequate statements after the interviews. Director Black then stated, "That's right, we talked about that in the Student Life meeting today. Bob's interviews were so terrible that they could not send the audio recordings out to be transcribed." The Plaintiff told Director Black that she would try to get Bob's work and all of her completed by Friday, February 15, 2019. The Plaintiff was able to complete written statements detailing and summarizing of all interviews that Bob conducted with Cairo Haynes and Antonia Banks. After the Plaintiff listened to hours of audio recordings, she immediately understood why Adrian Black and Dave Tiscione could not send the audio recordings to

73

a legal transcriptionist company to be transcribed.  The majority, of the audio recordings were Bob receiving text messages from Director Dave Tiscione telling him what questions to ask Mr. Haynes.  And, Bob used more than the majority of the time during the interviews trying to type Mr. Haynes answers to the questions.  At one point during the interview, Cairo Haynes asked Bob if he had answered his questions.  Bob replied by saying, "I don't know, I'm typing."  Bob interviewed Mr. Haynes of Feb. 01, 2019 at 1:00 p.m.  Mr. Haynes did not leave the Investigators' office until approximately 7:30 p.m. that night. Bob and I interviewed Mr. Banks on Feb. 06, 2019 at 11:00 a.m.

73. **February 14, 2019,** the Plaintiff was able to complete all of her assigned work tasks, and also, all of Bob's unfinished work.  The Plaintiff had to close herself in her office for at least 8-10 hours a day, for an entire week, so that she could complete all of her work and Bob Maglia's work.

74. After all assignments were completed, the Plaintiff sent Dave Tiscione updated statements which included all the information that he requested regarding the interviews with Cairo Haynes and Antonio Banks.   Also, on 02/14/19, the Plaintiff conducted a telephone interview with alumni Nicholas Perrotta (cell phone #561-655-1272) regarding the allegation that was made against Officer Wyche.  The Plaintiff typed a summary of the interview, and also, forwarded all pertinent information to Director Adrian Black via an email; thus closing the investigation.

75. On February 18, 2019, the Plaintiff left her office at about 12:30 p.m. to take her lunch break.  The Plaintiff signed out vehicle 960 which was assigned to the Investigators' office.  When The Plaintiff got into the vehicle, the vehicle would not start.  So, the

Plaintiff took the keys back into the office, and signed out the keys to 958 vehicle (The marked Pick-up Truck).  The Plaintiff then went into Sergeant's Konarski's office to inform him that she had signed out 958 keys.  But, no one was in the office.  Everyone had left the office to go out for lunch.  Since the Plaintiff had used 958 vehicle on prior occasions, to take bags of clothing to the House of Ruth; and, also I used a marked departmental vehicle to take collected boxes of food to the food bank and churches, the Plaintiff didn't think that there would be a problem using the vehicle; especially since using a department vehicle for department use and sometimes personal use was a part of the culture at Loyola University.

The Plaintiff used her lunch break to go to the Towson Mall to pick up a box spring and mattress which she had ordered the prior day.  The sales person of the store loaded the items onto the back of the pick- up truck.  The person who put the items on the truck told the Plaintiff that the items were secured.  When the Plaintiff left the parking garage, the Plaintiff got onto the beltway and stayed in the far, right lane and the Plaintiff had the hazard lights of the vehicle on.  Due to the fact, that it was an extremely windy day, the mattress fell off the truck and landed on the right, side shoulder of the beltway.  Since the Plaintiff could not back up on the highway, the Plaintiff got off the highway at the Charles Street exit.  When the Plaintiff entered back onto the beltway; and drove back to the location where the mattress fell onto the shoulder of the road, the Plaintiff noticed that the mattress was gone.  Someone had taken the mattress and left the Cap to a pick-up truck in the space where the mattress had fallen.  The Plaintiff then continued on and took the box spring to her apartment which was approximately

15 minutes away.  The Plaintiff returned to work minutes before her lunch hour was over.

Once the Plaintiff arrived back to her office, she immediately told Bob Maglia what had happened with the mattress that she picked up using 958 vehicle.  After the Plaintiff told Bob what happened, he immediately got up from his seat and left the office for approximately 20 minutes.  When Bob returned to the office, the Plaintiff walked over to Rudy Dawson's office.

The Plaintiff told Rudy about the incident.  Rudy told the Plaintiff that Adrian had just left the office to go to a meeting.  Rudy also stated, Adrian had just mentioned that someone told him that the Plaintiff had used "958" vehicle.  And, the Plaintiff's mattress had fell from the vehicle.

Almost 40 minutes later, the Plaintiff received an email from Adrian Black stating that he received a report that vehicle 958 was seen on the beltway with a mattress or a box spring attached to it.  He said, the vehicle was later observed pulling into an apartment complex somewhere off of Reisterstown Rd.   And, the key for "958" vehicle traced back to the Plaintiff.  Adrian requested to meet with the Plaintiff before the end of the day. On the same date at approximately 3: 30 p.m., The Plaintiff went to Adrian Black's office.  Adrian, Bob Maglia and, Rudy Dawson were all meeting in Rudy's office with the door closed.  When they heard the Plaintiff knocking on Adrian's office door, someone opened the door to Rudy's office.  Bob got up and walked out of the office.  Adrian then told the Plaintiff to come into the office (Rudy's office) and sit down.  Adrian asked the Plaintiff about the mattress and box spring that she picked up from Macy's.

76

Adrian told the Plaintiff that a male had called and said he saw the marked vehicle on the highway. Then Adrian said, "The person described everything that you were wearing." According to Adrian, it was as if the person was sitting in the vehicle next to the Plaintiff.

According to Adrian, the caller followed the Plaintiff all the way to the apartment complex somewhere off Reisterstown Rd. Adrian then told the Plaintiff, do not worry about anything. Adrian said, the call was transferred directly to him. And, Adrian assured the Plaintiff that he was the only person who had spoken to the caller.

When the Plaintiff asked Adrian what was the caller's name, he stated, he didn't know the male caller's name. He said, the caller stated that he was a Lieutenant General in the military. And, then he turned to Rudy Dawson and asked, "Didn't the caller say he was some type of general?" Rudy stated, "Yeah, he said he was a Lieutenant General." Then, Adrian and Rudy both started to laugh.

Adrian also stated that the caller said, he had children who were currently attending Loyola University. The Plaintiff found it hard to believe that Director Adrian Black had such an in depth conversation with a caller who was allegedly making a complainant against a Loyola employee; but Adrian failed to get the caller's information.

Also, the key to each vehicle has a key locator on it (GPS). Adrian then stated, he was going to call the male caller back to take care of the situation. According to Adrian, he wanted to make sure the caller did not contact Father Brian Linnane, the President of Loyola University.

77

Adrian then told the Plaintiff not to worry about anything. He stated, he had a headache; and he was going home.  When Adrian left Rudy's office, Rudy also told the Plaintiff not to worry about anything.  Rudy said, the situation was minor compared to everything that was going on with other officers in Campus Police.  After the conversation ended, the Plaintiff returned to her office.

Rudy later came into the Plaintiff's office and, told the Plaintiff that Adrian had called Joan Flynn and he told Joan everything that the Plaintiff had told them about her using 958 vehicle.  At that time, Rudy told the Plaintiff that no one ever called the President's office and complained about the Plaintiff using the vehicle.

76. The next day, **Feb. 19, 2019,** the Plaintiff didn't hear anything else from Adrian Black about the fact that she had used 958 vehicle until the Plaintiff was preparing to leave to go home.  Rudy Dawson approached the Plaintiff and said, "Oh, by the way, Adrian told me to tell you to just write an Administrative report about the fact that you used 958 vehicle and give it to him."  When the Plaintiff asked Rudy, why was she being asked to write an Administrative report, he replied, "Don't worry, nothing is going to happen with it."  Rudy then said, you can go talk to Adrian about it if you would like to.  When the Plaintiff walked over to Adrian's office, he was not in his office.  Since it was well after 4:30 p.m., the Plaintiff left work for the day.

77. The next day, **Feb. 20, 2019**, the university was closed due to bad weather.

78. On **Feb. 21, 2019**, due to the fact that Baltimore County Schools opened 2 hours late, (the Plaintiff transported her son to school every day), the Plaintiff arrived at work at approximately 10:04 a.m.  Due to the fact that it was extremely cold and the roads were

icy, the Plaintiff drove her vehicle to work. Once the Plaintiff arrived at 5104 York Rd.,
she parallel parked her personal vehicle in the 400-blk of Notre Dame Lane. (A city
owned street). Due to the snow and ice that was on the ground, the Plaintiff had to
maneuver her vehicle, so that she was able to squeeze the vehicle between two cars in
order to parallel park the vehicle. The parking spot was so tight, that the Plaintiff's rear
bumper was almost touching the front bumper of the vehicle that was parked behind
the Plaintiff's vehicle. The Plaintiff exited her vehicle and walked over to 5104 York Rd.,
her place of employment.

79.  At approximately **10:24 a.m**., while the Plaintiff was sitting at her desk; she received a
call on her cell phone from Rudy Dawson. When the Plaintiff answered the phone, Rudy
said, "Delsie, your car is being ticketed right now. You might want to come out here and
see about the ticket." The Plaintiff told Rudy, okay. The Plaintiff waited several minutes
before she left the office. The Plaintiff was thinking, if the ticket was already placed on
the vehicle; there was no need to go out and "see about" the ticket. At that time, the
Plaintiff said to Bob Maglia, "Parking and Traffic officers never come anywhere near the
400-blk of Notre Dame Lane. There are no parking meters or ticket boxes anywhere
from the 400-blk - 600-blk of Notre Dame Lane." The Plaintiff then said, "I wonder if
someone called the Baltimore City Parking and Transportation unit and requested that
an officer respond to the location to ticket my car."
The Plaintiff then got up from her desk, and walked out of the side door of 5104 York
Rd. When the Plaintiff arrived in the 400-blk of Notre Dame Lane where her vehicle was

parked, she noticed that the Baltimore City traffic and patrol division employee was in

his vehicle, stopped at a red light on Notre Dame Lane (heading eastbound) at York Rd.

When the Plaintiff reached her vehicle, she looked at the ticket.  The Plaintiff then took

the ticket off of her windshield and placed it inside her vehicle.  The Plaintiff began to

walk back to 5104 York Rd.  Then, all of a sudden, the Plaintiff got a bad feeling in her

stomach.  The Plaintiff turned around and walked back to her vehicle.  The Plaintiff got

inside her vehicle and drove to another parking location approximately four blocks away

from 5104 York Rd.  When, the Plaintiff returned to 5104 York Rd., she noticed that

Rudy Dawson was standing in the doorway of Adrian Black's office.  The Plaintiff also

noticed that Rudy had a strange look upon his face.  The look appeared to be a look of

panic or worry.  Rudy immediately asked the Plaintiff, if she had taken care of the ticket?

The Plaintiff simply replied, "Yes."

When the Plaintiff walked over to her office and entered the office, Bob immediately

stated to the Plaintiff, "Adrian wants to have a meeting with you."  The Plaintiff replied,

"Okay."  The Plaintiff grabbed a pen and pad from off her desk and over to Adrian's

office.  The Plaintiff noticed that Bob was following her to Adrian's office.

When Bob and the Plaintiff entered into Adrian's office, the Plaintiff noticed that Adrian

and Rudy were both seated and waiting inside the office.   Bob immediately closed the

door behind him.  The Plaintiff noticed that the "white noise box" was already turned

on.  Adrian then told, the Plaintiff to have a seat.  Adrian then started the conversation

by saying, "So, you got a ticket on your car!"  The Plaintiff replied, "Yes."  Then the

Plaintiff asked, "Are we having a meeting because I got a ticket on <u>my personal vehicle</u>?"

Bob then answered with a tone of anger, "I told Adrian and Rudy that you thought someone from here called Parking and Traffic to come up here to put a ticket on your car. We thought that we should discuss this in front of the Director as to why you think that someone here called."

The Plaintiff answered by saying, "First and foremost Bob, I don't need you speaking to anyone on my behalf. You need to worry more about getting your work done." Then the Plaintiff stated, "I've worked at Loyola for almost seven years. Since I've been employed here, I've never seen Baltimore City Parking and Transportation come in this area. The only time that someone from Baltimore City Parking and Transportation comes to this area, is when Rudy calls Kevin Marks, (former Loyola Campus Police employee who now Sergeant for Baltimore City Parking and Transportation and also Rudy's best friend)." Rudy has often called Kevin, and, asked him to send persons from Parking and Transportation to help control the traffic during the school year when the students move back onto campus.

Rudy then spoke up and stated, "I wasn't the person who called. I would never do anything to hurt you. I am hurt that you think that it was me who called." Rudy also stated, we as black people always betray one another. But, I wasn't the one who called." Rudy continued and stated, "I saw when the guy put the ticket on your car. I did a U-turn in the middle of the street. I was going to say something to him but I knew that Adrian would not have wanted me to say anything to him."

The Plaintiff then said, "I found it highly ironic that you were there the around the time that the ticket was placed on my vehicle. So, I called Parking and Transportation and

81

asked the dispatcher if they received a call to have someone respond to the 400-blk of

Notre Dame Lane to ticket a car.  And, the dispatcher told me that a male from Loyola

University called and requested to have someone respond to the area of the 400-blk of

Notre Dame Lane to ticket a vehicle. "

At that time, The Plaintiff noticed that Adrian had a smirk on his face.  Adrian then said

in a condescending tone, "Oh, so someone told you that the call came from Loyola.  Is

that what they said, the call came from Loyola!"  Adrian then asked the Plaintiff if she

thought that Lieutenant Denise Thompson had called.  The Plaintiff told Adrian that she

did not think that Denise called because Denise was not working.  Adrian then asked the

Plaintiff if she thought that one of Loyola's campus police officers had called to have her

car ticketed.  The Plaintiff told Adrian, one of Loyola's officers would not have done that.

At that time, Rudy stated, "Well, I wasn't the person who called.  If you don't believe

me, I have the ticket officer's name and cell phone number."  Rudy held up a small piece

of paper in his hand and waved it in the air.  Rudy then stated, "His name is Donald

Evans. Here is his phone number. Let's call him now, and, asked him if I was the person

who called."

The Plaintiff then stated, "We do not need to call the person back to verify anything.

The ticket was only $30.00."  At that moment, the Plaintiff noticed that Adrian signed

heavily; and, his mouth dropped open wide.  Adrian then stated, "The ticket was only

thirty dollars?!!"  Adrian then asked the Plaintiff, if the ticket was still on her vehicle?

The Plaintiff told Adrian that she had taken the ticket off the front windshield of her

vehicle.  Adrian seem to be flabbergasted.  Adrian replied, "What! Is the ticket still on

your car?" The Plaintiff told Adrian that she had placed the ticket inside her vehicle.

The Plaintiff also told Adrian that she had moved her vehicle.  At that moment, Adrian

had a look of shock, uneasiness and even anger upon his face.  Adrian immediately said,

"I need everybody to get out of my office.  I need a minute.  We will re-visit this meeting

in about 15 to 20 minutes.  But, right now, I need everyone to leave."  As Rudy, Bob and,

the Plaintiff were exiting Adrian's office, Adrian told the Plaintiff to close his door.  Bob

and Rudy walked across the hall and entered into Rudy's office.  The Plaintiff walked

over to her and Bob's office and continued to work.  At approximately 20-25 minutes

later, Bob knocked on the investigators' office door and told the Plaintiff that Adrian

wanted to continue the meeting.  At that time, The Plaintiff was in the middle of

conducting an interview with a student.

When the Plaintiff completed the interview and returned to Adrian's office, she noticed

that Bob and Rudy were already in the office with Adrian.  Adrian immediately stated,

"Well you got a ticket on your personal vehicle for expired tags.  Since your tags are

expired, we know that the vehicle is uninsured."

At that point, the Plaintiff stated, "Wait a minute.  That's not true.  I would not drive an

uninsured vehicle."  The Plaintiff told Adrian that her vehicle was in fact insured.  The

Plaintiff reminded Adrian that the only information that an insurance company needs to

insure a vehicle are the make and mode of the vehicle, and the VIN number of the

vehicle.

Adrian, then paused for a few minutes as if he was thinking.  He then slowly stated,

"Well, you getting a ticket on your personal car really is not a Loyola issue.  I really don't

know why we are having this meeting. Your tags being expired is an issue that you have with the State of Maryland. And, that's not a Loyola issue either."

Adrian then said, the only thing that I did noticed was that there was a lot of tension in the air between you and Bob. I want to remind everyone to be professional." Adrian, then told the Plaintiff, "Don't tell anyone that you got a ticket on your vehicle. Rudy, Bob and I won't tell anyone. So, please don't tell anyone that you got a ticket." At that point Adrian asked Rudy and Bob to leave his office so that he could speak with the Plaintiff alone.

Once Rudy and Bob left the office, Adrian said to The Plaintiff, "I noticed that there is a lot of tension between you and Bob. Why don't you move out of that office and, let me put you somewhere else."

The Plaintiff told Adrian, that the small tension that he was picking up on; came from the fact that she had to complete the all of Bob's work when Bob left to go vacation; even though Adrian told Bob to make sure his urgent cases were completed prior to him going on vacation. The Plaintiff also told Adrian that was not the first time that she had to complete the majority of Bob's work (which Adrian already knew) or completely redo all of his work.

Adrian then stated, "I know that you do more than the majority of the work in the office. And, I know that Patrick Weber and Sergeant Konarski do a lot of Bob's work as well." Adrian continued and said, "I have come into our office and seen Bob either slouched down in his chair; or kicked back with his feet up on his desk. Since I have

been at Loyola, I have been staying on Bob trying to get him to produce more."   Again

Adrian stated, "I still think that you should move out of that office."

The Plaintiff told Adrian that she was fine sharing an office with Bob.   The Plaintiff also

said that she had nothing against Bob.  The Plaintiff again expressed to Adrian that her

only concern was that Bob failed to do his work.  And, as a result, the Plaintiff had to

consistently do Bob's work and her work.

The Plaintiff also told Adrian, for the first time in almost six years; since she had been

working with Bob, she noticed that he was actually trying to do some work; even if it

was the bare minimum.  The Plaintiff also told Adrian that she and Bob needed to be in

the same office so that they could collaborate on investigations.  Adrian then stated

again, "I think you need to move out of that office."

Adrian then stated, "But the two of you don't like each other.  Rudy told me that the

two of you don't get along.  I never see the two of you just taking when I come into your

office."

The Plaintiff assured Adrian that she and Bob did talk.  The Plaintiff told Adrian that she

and Bob discussed the cases and personal concerns all the time.  The Plaintiff also told

Adrian that she and Bob did not have to be best friends in order to be co-workers; and

in order get the work done.  Adrian again suggested that the Plaintiff should move out

of the office that she shared with Bob.

Before, Adrian concluded the meeting, he said, "Oh, by the way, I told Rudy to tell you

to give me an Administrative report about you using 958 vehicle.  You did not give it to

him."  The Plaintiff told Adrian that she had not written the administrative report yet

because Rudy asked her for the report at the end of the day on Tuesday.  And, the following day, the university was closed.

When the Plaintiff returned home that evening, she was upset and concerned about the tone of the meeting.  The Plaintiff felt as if she had been ambushed and attacked in meeting that Director Black, Assistant Director Dawson and Robert Maglia had with her that afternoon regarding a ticket that she received on her personal vehicle that was parked on a Baltimore City street.

Later that evening, the Plaintiff called several family and friends whom she confined in and told them about the ticket that she had gotten on her vehicle.  The Plaintiff also told them about the meeting that Adrian, Bob, and, Rudy had with her regarding the parking ticket that she received on her personal vehicle.  One of the persons that the Plaintiff told about the entire incident was Loyola University Officer Darlene Wing.

80. On <u>Feb. 22, 2019</u>, the Plaintiff arrived at work between 8:00 a.m. – 8:10 a.m.  The Plaintiff noticed that Rudy's office door was opened which was unusual for that time of morning (Rudy normally came to work after 9:30am).  The Plaintiff hung her coat up in her office.  And then, the Plaintiff walked over to Rudy's office.  Rudy was sitting at his desk when the Plaintiff greeted him.

The Plaintiff asked Rudy if she and he were okay.  Rudy said, "Yes, of course.  You know how we do." Rudy and the Plaintiff then did a fist pound.

The Plaintiff sat down, and then asked Rudy if Adrian was in his office.  Rudy stood up, leaned over his desk, and, looked towards Adrian's closed office door.  Rudy then said, "He's in there. His light is on." Rudy then said, "He must be awake now."  Rudy also

stated, almost every morning Adrian comes in, he goes inside his office and keeps the lights turned off so that he can sleep. Rudy asked the Plaintiff if she had ever noticed that Adrian always put eye drops in his eyes. The Plaintiff replied, she had noticed that. The Plaintiff also told Rudy, that she noticed that Adrian always keeps his office door closed and locked when he is inside the office. And, The Plaintiff also stated that she noticed that Adrian never opens the blinds to his office windows. The Plaintiff also mentioned that a few times, she had knocked on Adrian's office door; and, when he unlocked and opened the door; he looked as if he had just woke up. The Plaintiff always noticed that Adrian would stretch both his arms and then rub his face with both his hands. Then he would reach for his eye drops and place the drops in both his eyes. Rudy then stated, "Yes, that's because he be in there asleep. He still teaches three times a week, at night, at Georgetown University." Rudy then stated, when Adrian turns the lights on inside his office, he then watches the CCTV cameras live all morning until he has to leave and attend a meeting."

Rudy continued the conversation by saying, "You know they gave him all the EEOC complaints that were filed against Tim Fox and Loyola University Maryland. They want him to try to get rid of the complaints. He has been reading over all the complaints for weeks now, and asking me questions about the complaints."

Rudy also told the Plaintiff, that he did not know how Adrian got the position of Director. Rudy stated someone from "high up" just pulled Adrian in. Rudy, also stated Adrian, never interviewed for the position because he noticed that Adrian's name was not on the list of Finalist. Rudy continued and stated, he noticed when Adrian started

with the University, Adrian, did not recognize anyone who would have been on the interviewing board had Adrian interviewed for his position.

Rudy also spoke about how Joan Flynn had tainted the interviewing process for choosing a Director for Public Safety, by allowing Timothy Fox to be involved in the process underhandedly. And, again Rudy talked about the meeting that he had with Joan Flynn after Tim Fox accidently included him on an email, response that was meant for Joan Flynn and Kate Grubb. Rudy appeared to get angry as he was retelling the story.

Rudy then stated, he knew for a fact that Adrian did not go through the hiring process to become the Director of Public Safety because he was not interviewed by the hiring board. Rudy, then stated Adrian was never an Assistant Director nor was he ever a Director at any University prior to being hired by Loyola University. He also said, Adrian was a sergeant for the Georgetown University Public Safety Department for a few years. He then moved from his position as a Sergeant to an administrative position which allowed him to instruct and set up the Emergency Management System at Georgetown University.

Rudy then stated, he believed that Joan Flynn and Adrian Black were involved in a sexual relationship. Rudy also said, every time that he, Joan and Adrian had a meeting, Joan consistently make it a point to tell Adrian that he could call her at any time during the night if he needed anything; especially since she and her husband, Joe Bradly (who also works for Loyola University) were no longer together. Rudy stated, Joan Flynn consistently flirted with Adrian Black in front of him.

Rudy then stated, Adrian told Joan everything.  And, Adrian was always in Joan's office.

According to Rudy, Joan often had Adrian doing secret missions that Adrian refused to

share any information about.  Rudy also said, he always knew when Adrian was working

on something that was secretive because Adrian would take his calls on his cell phone.

And, Adrian would then walk to his personal vehicle that he parked on the front parking

lot of 5104 York Rd.  He would then get inside his personal the vehicle; and continue to

talk on his cell phone.  Rudy stated, he thought that either Joan Flynn or Robert Kelly

hired Adrian without going through the hiring process.

The Plaintiff then stated, it would not surprise her if Adrian and Joan were involved in a

sexual relationship because, she noticed how Joan was looking at Adrian when Loyola

University had the Annual Tabletop Exercise on January 11, 2019.  And, if Joan and

Adrian were involved romantically, it would explain why Adrian appeared to be so very

upset when he learned that Tim Fox came back to Loyola to visit Joan Flynn.  At that

time, the Plaintiff and Rudy concluded their conversation.

After the Plaintiff conversed with Rudy, she returned to her office and processed all the

information that he had given her.

81. The Plaintiff then decided to review the CCTV camera footage for **February 21, 2019**

from <u>9:00 a.m. to 10:40 a.m.</u>  As the Plaintiff reviewed the camera footage, she noticed

that on <u>Feb. 21, 2019</u> at approximately 9:40 a.m., Rudy left his office located at 5104

York Rd. and walked onto the front parking lot and got into the white Chevy, Equinox.

As Rudy drove the vehicle out the front gate, of 5104 York Rd., Adrian was entering onto

the parking lot of 5104 York Rd. through the side gate.

Rudy arrived at Newman Towers. He parked the vehicle in the rear of Newman towers and swiped in through the laundry room entrance of the building at approximately 09:45 a.m. Rudy entered the building and walked to the Event Services office. After about 5-10 minutes, Rudy exited the Event Services office carrying a folder. He then walked back to his vehicle and got into the vehicle. He then drove away from the building.

The Plaintiff also noticed, from reviewing the CCTV camera footage, that at approximately 10:17 a.m., someone driving a white vehicle from the Department of Transportation turned westbound onto Notre Dame Lane. The Plaintiff's personal vehicle was parked on the right-hand side (westbound) in the 400-blk of Notre Dame Lane. The Plaintiff could clearly see her vehicle on the camera footage because the vehicle was parked directly across from the camera. There were at least two to three vehicles parked in front of the Plaintiff's vehicle. And, several vehicles were parked behind the Plaintiff's vehicle. There was a small amount of snow on the ground around the vehicles. All the automobiles were parked so closely together; that anyone who was just driving down the street would not have been able to see the tag the Plaintiff's vehicle rear bumper. Also, there are no parking meters or ticket boxes anywhere in the 400-600 blk. of Notre Dame Lane.

The male ticket officer who was driving the Dept. of Transportation vehicle, parked his vehicle in front of a car that was parked at least 2 to 3 vehicles in front of the Plaintiff's car. The male driver sat in his vehicle for at least five minutes. Then the driver exited his vehicle as he was holding his cell phone to his ear. The officer then stood outside his

90

vehicle, just in front of his driver's side door.  At that moment, Adrian Black was

captured on the CCTV camera footage walking out the front lobby door of 5104 York Rd.

Adrian was holding his cell phone to his ear.  Adrian then walked towards his personal

vehicle (Ford Explorer).  He then got into his vehicle while he was talking on the cell

phone.  At the same time, Rudy was turning onto the 400-bk of Notre Dame Lane

coming from Northbound on York Rd.

Rudy then drove to where the Dept. of Transportation ticket officer was standing

outside his vehicle.  Rudy made a U-turn in front of the officer.   He then slowly drove

towards the Plaintiff's vehicle and stopped.  Rudy then reached his arm out the window

and pointed towards the Plaintiff's vehicle.  The male employee from the Dept. of

Transportation then walked towards the Plaintiff's personal vehicle. The ticket officer

then walked over to the rear passenger side of the Plaintiff's vehicle and looked at the

tag.  The Transportation Officer could not walk behind the Plaintiff's vehicle because the

rear bumper of the Plaintiff's vehicle was almost touching the front bumper of the

vehicle that was parked behind her car.  The transportation officer then walked back

around to the driver's side of the Plaintiff's vehicle and placed a ticket on the front

window shield.  The officer then walked back to his vehicle and entered the vehicle,

started the vehicle and completed a U-turn; and, then he drove up to the light.  The

officer never checked or ticketed any other cars that were parked in the 400-600 blk. of

Notre Dame Lane.

As the ticket officer was driving away, The Plaintiff was captured on CCTV camera

footage exiting the side door of 5104 York Rd, and, walking towards her vehicle. When

the Plaintiff arrived at her vehicle, the Dept. of Transportation vehicle was stopped at the red light at Notre Dame Lane and York Rd.   Spontaneously, Rudy had driven the white Chevy onto the parking lot of 5104 York Rd., and, he parked the vehicle directly beside Adrian's ford explorer.  Adrian exited his vehicle.  Rudy exited the Chevy.  Rudy and Adrian stayed on the parking lot of 5104 York Rd. for at least another 10 minutes talking to each other, as they turned their bodies and heads towards the Plaintiff, as she walked over to her vehicle.  Adrian and Rudy appeared to be watching the Plaintiff.  Tt wasn't until the Plaintiff viewed the CCTV camera footage that she realized that Rudy Dawson and Adrian Black both were both on the front parking lot of 5104 York Rd. as she exited the side door and walked towards her vehicle.  And, both the Director and Assistant Director watched the Plaintiff as she walked to her vehicle to retrieve the parking ticket.

*Note: The Plaintiff was so disturbed and bewildered by what she observed and learned from reviewing the CCTV camera footage, that she showed the video footage to Officer Darlene Wing, later on the same day.

The Plaintiff was able to better process and access of the meeting that Adrian Black, Rudy Dawson and Robert Maglia had with her on Feb. 21, 2019 after she reviewed the CCTV camera footage in the entirety.   The Plaintiff was also able to better process and analyze the meeting.

And, the Plaintiff then realized why Adrian Black was stunned and caught off guard during the meeting, why Robert Maglia was so upset, and why Rudy Dawson appeared to be disturbed during the meeting.  Based upon the information that the Plaintiff

92

received from Rudy the day following the meeting he, Adrian Black and Robert Maglia

had with the Plaintiff on February 21, 2019, and the Plaintiff's observation of the CCTV

camera footage, she summarized the following:

Adrian Black, Rudy Dawson, and Robert Maglia planned and executed contacting the

Department of Traffic and Transportation. Adrian Black requested that an officer from

the Department of Traffic and Transportation respond to the 400-blk of Notre Dame

Lane to place a ticket on the Plaintiff's vehicle for expired tags. Adrian Black Rudy

Dawson and Robert Maglia, all knew that, until the Plaintiff's vehicle was ticketed, a

Baltimore City Police officer would not respond to the location to tow the vehicle off the

public street without the vehicle being ticketed first.

Adrian, Rudy and Bob planned to create a hostile situation for the Plaintiff, by getting

her vehicle ticketed; and then telling the Plaintiff about the ticket as the officer was

placing the ticket on the vehicle. They were hoping that the Plaintiff would be upset

enough to create a commotion or disturbance with the ticket officer. So that, they could

witness the disturbance; therefore have an excuse to terminate the Plaintiff from her

position.

When the plaintiff did not confront the ticket officer, the Plaintiff interrupted Adrian,

Rudy and Bob's plan. The Plaintiff further foiled the plan when she removed the ticket

from the vehicle and then moved her car.

Adrian, Rudy and Bob were all expecting a different outcome. When the situation did

not unfold according to their plan, they ambushed the Plaintiff by having a meeting with

her regarding the fact that she got a ticket on my personal vehicle.

Once Adrian, learned that the Plaintiff removed the ticket from her vehicle; and realized the Plaintiff had moved her vehicle to another parking space, he appeared to be taken aback.  Adrian did not expect that the Plaintiff was going to remove the ticket from the vehicle and re-locate her vehicle to another parking space.

Angered and Upset after hearing the news, Adrian instantly and abruptly ended the meeting.  Adrian had to regroup and quickly come up with another plan because he had already contacted Baltimore City to respond to tow the Plaintiff's vehicle. He had to cancel that request and come up with another plan.

The only other allegation or situation that Adrian thought he could create, was to say that the Plaintiff was unprofessional in the meeting that he, Rudy and Bob ambushed the Plaintiff in; in an effort to create yet another hostile environment hoping that the Plaintiff would react in an unprofessional manner once she was placed "in the fire" sort of speak. But, when the Plaintiff was able to professional defend herself, Adrian Black and Joan Flynn, whom Adrian was having a sexual relationship with; had to come up with an excuse to justify terminating the Plaintiff.

During the meeting, when the Plaintiff told Adrian that she knew someone had called the Dept. of Traffic and Transportation and requested that an officer respond to the 400-blk of Notre Dame Lane to place a ticket on her vehicle, Adrian became even more upset.  He tried to shift the Plaintiff's focus to Denise Thompson or the campus police officers by suggesting that maybe one of them had called the Dept. of Transportation. When Adrian did not get the type of reaction that he wanted to get from the Plaintiff, he abruptly ended the resumed meeting by saying, "There is no reason we should be

having this meeting.  You getting a ticket on your personal vehicle is not a Loyola

matter."  Adrian, then dismissed Rudy and Bob from the meeting.  After Rudy and Bob

left Adrian's office, Adrian immediately tried to convince the Plaintiff to move out of the

investigators' office.

82. On **February 25, 2019** at approximately 4:15 p.m., Adrian Black came into the

Investigators' office and asked the Plaintiff to let him hold the digital recorder that she

used to take recorded statements during investigative interviews.  The Plaintiff handed

Adrian the digital recorder.  Adrian then turned and walked out of the office.  The

Plaintiff then got up from her desk and exited the office to walk to the restroom.  As the

Plaintiff turned the corner of her office, she almost collided with Adrian.  Adrian then

stated, "Can I see you in the conference room for a minute."  The Plaintiff followed

Adrian to the conference room.  The Plaintiff noticed that Joan Flynn was approaching

and, Joan began to walk behind the Plaintiff.  When the Plaintiff looked backed to speak

to Joan, the Plaintiff noticed that Joan had what appeared to be a look of distain, almost

hate on her face.

When the Plaintiff reached the conference room, the Plaintiff noticed that Elaine

Kudsieh (HR Specialist) was already seated in the conference room.

 When the Plaintiff sat down at the table, Adrian said, "Alright Delsie, I'm going to just

jump right in, we are terminating you."  When the Plaintiff asked, "Why am I being

terminated?" Adrian mumbled with his head down, "You parked your vehicle on the

parking lot after I told you not to do so. You were unprofessional in the meeting on the

21st, and, you used "958" vehicle without permission."  Adrian never lifted his head to look at the Plaintiff in her eyes.

Adrian Black and Loyola University terminated the Plaintiff without first giving any supervisory verbal or written warnings.  The Plaintiff had never been placed on a Performance Improvement Plan (PIP), which the Plaintiff had seen supervisors at Loyola University Maryland do for so many other campus police officers and supervisors.

The Plaintiff was grossly terminated from her position as an Investigator without an equitable due process.

The Plaintiff was terminated after she continuously received retaliatory treatment because of the EEOC complaints that she filed with the Federal EEOC Commission. Adrian Black knew that the fact that the Plaintiff used the department vehicle on her lunch break, as she had done before; was not a reason to terminate the Plaintiff from her position. Especially since using the departmental issued vehicles was a normal practice at Loyola University; even for the students. In fact, it is a part of the culture at the university.

83. As the Plaintiff now viewed the entire situation in totality, the Plaintiff recognized the fact that immediately after Adrian Black was hired, he insisted that that the Plaintiff move out of the investigators' office.  He tried to present the suggestion to the Plaintiff as if he was giving her something by offering her a separate office.  When the Plaintiff told Adrian that she did not need an office to herself; Adrian immediately had to come up with a plan "B" to try and isolate the Plaintiff from her co-workers and those whom she was close to. Adrian Black worked hard to try and gain the Plaintiff's trust by

consistently requesting to meet with her in his office.  And, by closing the office door and turning on the white box, he tried to make it appear to other supervisors (Particular Ruffus Dawson) that the Plaintiff was providing him with information concerning other employees.  Adrian Black's main goal was to sever the bond and friendship that the Plaintiff and the Assistant Director, Rudy Dawson had. And, Director Black worked hard to create conflict between the Plaintiff and Robert Maglia.  When Director's Black initial plan failed, he capitalized on the situation that the Plaintiff used "958" vehicle to transport her personal items to her home; as a catalyst to carry out his, Joan Flynn, and Jocelyn Kelly's plan to have the Plaintiff terminated from her position.   Director Black, Joan Flynn and Jocelyn Kelly's goal by having the Plaintiff terminated was to seek retribution for the Plaintiff filing an EEOC complaint against Timothy Fox and Loyola University.  Rudy Dawson, Robert Maglia, and Denise Thompson knowingly or unknowingly helped to execute the plan.

Adrian Black, was well aware that the Plaintiff had an established and an excellent work history with Loyola University; that of which Adrian envied as well.  In fact, Adrian told the Plaintiff that he recognized that she did more than, the majority of the investigations in the unit. The Plaintiff had never been written up for anything.  The Plaintiff received excellent performance evaluations.  The Plaintiff had never been placed on Probation, and/or suspended for any reason.  And, the Plaintiff had never been placed on a 45 day or 90 day Performance Improvement Plan; as many other officers have in the department.  Therefore, Adrian Black along with Joan Flynn created

a several lies in order to get the Plaintiff terminated from the Loyola University.  But, the termination was unreasonable and inequitable.

## COMPARATORS

84.  For example, Lieutenant John Goods took a marked department vehicle home all the time.  In fact, citizens from his community called Loyola University Campus Police all the time reporting that there was a Loyola University campus police vehicle parked in the 1200-blk E. Coldspring Lane. (Lt. Good's girlfriend lived in the 1200-blk E. Coldspring Lane).  Lieutenant Goods was on duty while spending time with his girlfriend.

a.   Also, on **February 21, 2019**, just before midnight, Lieutenant John Goods contacted the campus police dispatcher and requested that an officer meet him in the 1200-blk E. Northern Parkway near the apartments because the departmental vehicle would not start.  The midnight shift lieutenant, Vinny LoBiondo responded to the location, and, was able to hot shot the vehicle to get it started.  That was not the first time that John Goods had been reported having a vehicle off campus.  The next day, Rudy Dawson and Vinny LoBiondo laughed about the incident.  Rudy Dawson told the Plaintiff, that he had spoken to John numerous times about taking the department vehicles off campus to visit his "women" during his tour of duty.

b.  Another example of supervisors using the departmental vehicles for personal use; Raymond V. Infussi had been employed with Loyola University for almost

two years.  He did not have a personal car.  Ray used a departmental vehicle to travel back and forth to work every day.  On **02/19/19**, when the university was closed due to bad weather, Ray had an accident with the departmental vehicle.

c.  Another former Loyola University Police officer, Sherri Batiste use the Loyola University departmental Boxcar van at least three times to move items from her house in Maryland to her house in Delaware.  On **October 19, 2016**, she had an accident with the vehicle on the parking lot of 5104 York Rd.  Batiste hit the top of the garage with the truck and damaged the structure.  Batiste received no supervisory punishment.  And, she nor her insurance company had to pay for the damages that were caused.   The Plaintiff listed the above incidents to show how prevalent it was for employees of Loyola Campus Police to use the departmental vehicles for personal use.

85. Again, as the Plaintiff look back and began to process and analyze Director's Black intent and focus, she realized that from the first day that she met Adrian Black, she now understands that Adrian was hired and instantaneously assigned a mission to come into Loyola University Campus Police as a "Black" Director; and gain the trust of the African Americans and all those who filed EEOC Complaints against Loyola University Maryland within the Campus Police Department.  Adrian pretended that he wanted to create a positive change within the Campus Police Department.  Adrian constantly said, "The higher ups told him that Tim Fox created major problems in the Department." According to Adrian, he was hired to change the racist culture and unfair practices that were apart of the Loyola University Maryland Campus Police Department.  Adrian was

given the task and agenda of terminating the Plaintiff, as well as others whom Management, particularly (Joan Flynn, Robert Kelly, Kathleen Purnell and Jocelyn Kelly) did not like.  Adrian immediately started to execute his assignment shortly after he accepted the position as Director of Loyola University Campus Police.  Not only did almost everyone learned that Adrian Black was having an affair with Joan Flynn, but the Plaintiff as well as other employees learned that Adrian Black was close friends with Robert Kelly, the Vice President of Loyola University.  And as an act of nepotism, Robert Kelly hired Adrian Black as the Director of Public Safety.

86. Initially, Adrian Black began to antagonize Rose Devon (the Administrative Assistant for Public Safety – Caucasian female) by having someone from Technical Services mount a CCTV camera in the ceiling that was located directly outside of Rose Devon's office door. The camera lens was pointed towards Rose Devon's office door and captured Rose sitting at her desk. Immediately after the camera was placed outside of Rose's door, Rose complained and stopped coming to work.   Rose was absent from work for about a week.

87. Then, on **December 14, 2018**, Rose returned to work.  Rose and Adrian became engaged in a heated confrontation regarding the placement of the camera.  Rose left out of Adrian's office and slammed his office door. Rose then entered back into her office and slammed her door behind her. Adrian Black contacted HR and request permission to suspend Rose from duty for the remainder of that day.  Adrian walked over to the Investigators' office and asked that Bob and the Plaintiff, stand by while he spoke to Rose.  The Plaintiff followed Adrian to Rose's office where Rose and Adrian then became

engaged in another loud and heated argument.  At that point, Adrian told Rose to get her things and leave the building.  Also Adrian, asked that she take only her coat and purse because HR had given him permission to suspend her for a day.

Rose told Adrian that she was going to notify HR and inform them that he comes into work late every day and left early every day.  Rose also told Adrian that he had over stepped his boundaries and authority by placing a camera outside her office door to violate her privacy; and by placing hidden microphones in the Roll Call room.  Rose told Adrian that he would be hearing from her attorney.  At that point, Adrian became very visibly upset.  The Plaintiff noticed that Adrian's entire demeanor changed.  Adrian clinched his fist and tightened his lips and said in a low and forceful tone, "You don't know nothing about me!" The Plaintiff stepped between Adrian and Rose and tried to de-escalate the situation.  The Plaintiff motion at Adrian, using her right hand to suggest that he calm down.  At that point, Adrian backed off and stopped talking.  But Adrian's entire facial complexion had turned bright red and he was clearly very angry.

At that point, the Plaintiff was able to calm both Rose and Adrian down, and diffuse the situation.  The Plaintiff then walked Rose to her vehicle.  Immediately following the incident, Adrian thanked the Plaintiff for de-escalating the situation.  Adrian then asked the Plaintiff and Bob to write an Administrative report detailing what had happened.  The Plaintiff gave Adrian the Administrative report. Rose Devon was suspended for only one day.  Prior to Rose Devon being suspended on that day, she had been suspended from Loyola University before.  Honestly, Rose Devon and Tim Fox were both stealing money from Loyola University for years.  Rose Devon only came to work one day a week

101

for years.  But, Timothy Fox made sure he paid her for the entire week.  The Plaintiff

truly believes that Adrian Black was told to fire Rose Devon.

88. Then on **February 26, 2019**, immediately after the Plaintiff was terminated, in an

attempt to appear to be fair and equitable, Adrian Black and Human Resources had to

go back and suspend Bob Maglia (a Caucasian male) for five work days for violating the

University Policy by (Allowing Timothy Fox to enter Loyola Buildings using his

identification card).  An email was sent out to all Directors and above stating that both

Bob and the Plaintiff were terminated from their Investigative positions.  The email

regarding Bob Maglia was immediately retracted.  Adrian only suspended Bob for five

days, even though Bob violated the University's Policy on three separate occasions by

letting Tim Fox use his swipe identification card.  Not only did Bob continue to violate

the university policy after he was given a verbal warning from Adrian after the first

violation; but Bob wrote a false Administrative report stating that he did not violate the

policy again after he was given that verbal warning.  In fact, Jocelyn Kelly should have

been terminated as well because Tim Fox was given a duplicate identification card in

Robert Maglia's name so that he could enter and exit anywhere on campus using the

swipe card.  The Plaintiff observed Timothy Fox on CCTV camera withdrawing the card

from his wallet, pulling the card out of a protective sleeve and then utilizing the card.

That card was his own personal card.  The card had to have come from Access and

Control which is supervised by Jocelyn Kelly, Tim Fox's ex-lover.

Bob Maglia should have been terminated from his position as Senior Investigator just based upon the aforementioned violations alone.   But, he also should have been terminated for his years of incompetency and the inattentiveness he gave to important case investigations.  The Plaintiff can list at least ten cases off the top of her head that Bob Maglia was supposed to investigate but he failed to conduct any type of investigation; as he normally did with cases.

    a.   The first case that the Plaintiff will mention is the investigation regarding Officer Keiosha Wyche.  That case was reported to Bob in November 2018.  Bob did absolutely nothing with the investigation.

        Even when Adrian Black told him to complete and close his investigation prior to him going on vacation in February 2019, Bob failed to complete the investigation.  The Plaintiff had to contact the 2nd student in the case and conduct a telephone interview.  Rudy Dawson and the Plaintiff eventually closed the case because Bob Maglia, failed to do his job.

    b.   Then there were the Theft cases with students Cairo Haynes and Antonio Banks.  Two students who reside on campus, and who were allowing two other non-Loyola students to come onto campus and help them enter dorm rooms in order to steal property. (LUPD Report no: 20190125-005311-000101, 20190127-005369-000111, 20190127-005311-000112, 20190203-005311-000013, 20190128-005311-000114, and 20190128-005311-00117,). The first theft incident was reported on January 25, 2019.  Student, Dylan Wilsberg (complainant) and two of his roommates responded to 5104 York Rd. and

reported his laptop was stolen from his room in Newman West 605 unit to Bob

Maglia.  Mr. Wilsberg also stated, he last saw his laptop on 12/18/18, before he

left for Christmas break.  Mr. Wilsberg and his roommates also reported that

they thought that Cairo Haynes, their other room-mate was responsible for

stealing the laptop from the room.  They said, they had caught Cairo in another

room-mates room; going through his personal belongings.  Bob did absolutely

nothing with the information.  Bob didn't even document the information in the

Incident report.  Bob never requested that Cairo Haynes come in for an interview

so that he could follow-up on the information that Mr. Wilberg's room-mates

had provided to him.

Then in February 2019, when Student Life representatives began to ask

questions about what was being done with the investigation; Bob lied and said

that he had no CCTV footage of the first reported theft incident because the first

theft occurred on or about December 18, 2018.    When, in fact, the CCTV high

definition digital cameras hold footage for at least 30 days or more depending on

the camera.  Bob never attempted to review the footage.

When Student Life representatives continued to ask Adrian what was being done

about the many thefts from Newman Towers, and, why hadn't Bob brought

anyone in to be interviewed; then Bob and Adrian basically asked me to work on

the case.

The Plaintiff conducted almost all of the CCTV camera review.  The Plaintiff

recorded and saved all the footage to the shared "H" drive so that Student Life

representatives could review the footage.  The Plaintiff reached out to Student Life about conducting an administrative search on Cairo Haynes and Antonio Banks dorm rooms.  And, the Plaintiff practically transcribed and typed up all the statements from the interviews.  Basically, Bob did almost nothing in the investigations.  Bob Maglia poorly conduct three interviews.

c.  Another case that Bob held onto for months without doing any investigation was a reported Hazing incident that involved members of the Loyola University Ice Hockey Team (LUPD report #20181018-5325-000132).  The incident was reported on October 13, 2018.  Even though the Plaintiff constantly asked Bob if he needed help with the investigation; and, if he had even started on the investigation, Bob continuously told the Plaintiff that he had it; and that he was taking care of everything.  It wasn't until early November 2018 that Student Life began to ask Adrian Black and Bob Maglia questions about what was being done in the investigation.

d.  Then on **November 05, 2018,** Adrian asked Bob and the Plaintiff to meet him in his office so that they could talk about the reported Hazing incident and detail the progress of the investigation.  Once Bob Maglia and the Plaintiff were inside Adrian's office, Bob immediately said, "I fucked up, it's all my fault.  I forgot about the case so I did nothing with the investigation."

Adrian appeared to be in shock.  Adrian stated that Christina Spearman (Dean of Students) Neil Andrito, and, David Tiscione were all waiting on the results from the investigation.  Adrian said, they all wanted to move forward with the

adjudication process as quickly as possible.  Everyone thought that Bob had

already started his investigation; and, they thought that Bob had already

scheduled follow-up interviews with the members of the Ice Hockey Team who

had participated in a scavenger hunt and hazing incident on Oct. 13, 2019.

 Christina Spearman had already given sixteen members of the team who

participated in the scavenger hunt a questionnaire to complete.   The collected

questionnaires, spread sheets and request for camera footage that Christina

Spearman sent to Bob immediately following the reported incident; Bob did

nothing with. Bob never even reached out to the members of the team to

schedule follow-up interviews.

 And the Plaintiff would be remised if she did not mention that one of the

members of the ice hockey team, Christian Lindenkohl's father, Scott Lindenkohl

works for Campus Police Lock and Key at Loyola University.  And, during the time

that the interviews were supposed to have been conducted; and, during the time

that Bob and the Plaintiff finally conducted the interviews, Scott Lindenkohl was

doing handyman work on Bob Maglia's house.  In fact, one of the challenges in

the scavenger hunt was the members of the team were supposed to have a drink

with Scott Lindenkohl.  Bob refused to bring Christian Lindenkohl in for an

interview.

Christina Spearman, Neil Andrito, and, Dave Tiscione wanted the team members

to be interviewed immediately.  And, they wanted the investigation to be

completed before November 16, 2018.  Bob stated that he was going to be off

from work on November 15th and 16th, 2018.  The Plaintiff told Bob that they were going to push hard to have the investigation completed by November 14, 2018.  The Plaintiff sent out invites to the members of the Ice Hockey Team; scheduling all the interviews.  The Plaintiff made sure that she scheduled at least 5-6 interviews per day according to the availability of the team members.  The Plaintiff also formulated all follow-up questions for each member who was interviewed.  The Plaintiff conducted almost all the camera review for the incident. And prior to each member of the team responding to 5104 York Rd. for their interview, the Plaintiff made sure that Bob had all necessary questions and paper work that he needed.  The Plaintiff also typed the summaries for more than half the interviews.  The investigation was completed by November 14, 2018.  Even then, Bob failed to send some of the typed summaries, those that he typed, over to Dave Tiscione.

e.  The above listed reported incident cases were just a few of the investigations that Bob failed to do or botched just in the short period of time that Adrian Black has been the Director of Public Safety.  Other major cases that Bob should have received supervisory direction and punitive consequences for his insubordination for failing to conduct investigates on assigned cases are listed below:

f.  In **2017**, there were two reported armed robberies that occurred on campus. Bob Maglia was assigned to investigate the cases.  The 1st incident occurred on January 01, 2017 and was reported under LUPD #20170117-005367-000051. The victim, Mr. Patrick Sweeney responded to 5104 York Rd., along with both his

107

parents; and met with Bob Maglia in the investigators' office.  Mr. Sweeney
detailed what happened during the robbery.  Once again, Bob never asked Mr.
Sweeney any questions.  The Plaintiff in fact, asked all the questions during the
interview.

 Bob failed to take any notes.  Bob did not record any of the detailed information
that Mr. Sweeney said about the armed robbery. Three weeks later, after Mr.
Sweeney's parents and students were calling the university and complaining that
nothing was done regarding the investigation of the robbery. Bob contacted Mr.
Sweeney via an email, and told him that the Plaintiff would be contacting him to
come in for an interview. But, the day that Bob contacted Mr. Sweeney, the
Plaintiff was out of the office.  Bob never spoke to the Plaintiff about him
wanting the Plaintiff to contact Mr. Sweeney.

Later, after the university received many complaints about the investigation and
the security on campus; Once again, Tim Fox and Bob Maglia tried to blame the
Plaintiff for the fact that no follow-up investigation was conducted on the case.
In fact, Timothy Fox and Bob Maglia sent Human Resources an Administrative
stating that the Defendant failed to do her job regarding the investigation of the
robbery.

g.  And, the other armed robbery that occurred on campus; and, Tim Fox assigned
the investigation to Bob Maglia, was the Car Jacking case which was reported on
October 04, 2017 under LUPD #20171004-005363-000036.  Once again, Bob did
absolutely nothing with the investigation.  Bob knew that most of the Car Jacking

incident should have been captured on the CCTV cameras that were located at the Gallagher Mansion.  Bob never went over to the Gallagher mansion to request to review the cameras.  Once again, after weeks passed and Bob conducted absolutely no investigation, the Plaintiff conducted the follow-up investigations and forwarded all the information to the Baltimore City Police Detective. The Car-Jacking incident put the Loyola University students, parents, faculty and staff in an uproar.  Faculty, staff and the student body demanded answers from Tim Fox.  And, Timothy Fox never sent out any alerts warning the Loyola University Maryland community about the carjacking or the many robberies and theft from automobiles that the Loyola Community were having in the same areas.

h.  LUPD Incident Report (#20160214-005386-000094), a reported serious aggravated assault which occurred on 02/14/16 (Sunday) at Zen West; when a group of Loyola students became involved in a bar fight.  Father Linnane (President of Loyola University) contacted former Director Tim Fox about the incident.  And, Tim contact Bob and told him to respond to work to investigate the incident.  At least fifteen students responded to 5104 York Rd. for interviews. Bob lied and told everyone that he went into the office on his day off (week-end day) to conduct an investigation. When again, Bob did absolutely nothing.  One of the patrol officers, Michael Nichols; who was not experienced in conducting investigative interviews, conducted the interviews.  Bob never responded to work to conduct the investigation.

But, Bob did submit an overtime slip alleging that he worked overtime hours. The following Monday and Tuesday, Bob still did nothing on the case. On Wednesday, February 17, 2016, Bob began his vacation. The Plaintiff had to conduct the entire investigation in a short period of time due to the fact that one of the students; who was involved in the altercation was placed on an interim suspension pending the investigation. When Dr. Sheilah Horton (former Vice President for Student Conduct) questioned why the investigation initially stalled; once again, Tim Fox covered for Bob Maglia. Tim Fox lied and told Dr. Horton that he never called Bob Maglia in to conduct the investigation. Bob Maglia never received any punitive repercussions for botching up yet another case investigation.

i.  And, the last and most relevant case that Bob Maglia should have been terminated for due to his inability to conduct a detailed investigation and concise interviews; was the case investigation involving students, James "Jimmy Joe" Granito and Courtney Mullins. The information regarding a dating violence and possible sexual assault came in via a Silent Witness Form on <u>November 25, 2013</u>. According to the Silent Witness report, on 11/16/13, Miss Mullins was visiting her boyfriend James Granito at an off campus housing location. Sometime during the morning hours, Miss Mullins sustained a wound to her head which caused her to develop a severe concussion. Miss Mullins called a female Loyola student to respond to the location to pick her up. Miss Mullins was picked up

and taken to the hospital where she was diagnosed to have post-concussion syndrome.

Bob Maglia and Sean Kapfhammer (former Assistant Director of Public Safety) conducted the investigation.   Neither, Sean or Bob wrote a report.  On December 13, 2013, Miss Mullins responded to 5104 York Rd. for an initial interview. I sat in on the interview with Sean Kapfhammer.

Without going into any further details regarding the case, James Granito was eventually expelled from Loyola University.  Bob and Sean Kapfhammer handled the investigation of this case so very poorly that they both should have been fired from the university.  James Granito's, parents threaten to file a law-suite against the university.  In the end, Kathryn K. Hoskins, an attorney at Gallagher, Evelius & Jones LLP who represented Loyola University, sent out an email to everyone requesting that all material, notes, documentation and recordings regarding the investigation of this case be destroyed.  Robert Maglia mishandled and failed to investigate a countless number of cases.  But, because he was a Caucasian male and good friends with Timothy Fox and Joan Flynn, there were never any consequences for his negligence and incompetence. And, the Plaintiff was always told to re-do or just do all of Bob's work which created a heavier work load for the Plaintiff.

  Finally, in August 2019, Robert Maglia was terminated from Loyola University Maryland for his incompetence and failure to do his job regarding a burglary/sexual misconduct case.

89. There have been so many other employees who work for Loyola University Maryland Campus Police, who should have been disciplined or terminated from their positions at the University. For Example: Campus Police Officer, Lieutenant Denise Thompson (A Caucasian female). Lieutenant Thompson has been employed at Loyola University Maryland for about 22 years. She has caused many problems at the University. First, Denise was initially hired at Loyola University Maryland as an officer and then she was promoted to Sergeant with Campus Police. She was the only female to have rank in the Campus Police Department for many years. Denise was known to have sexual relationships with her subordinates whom she supervised. One particular officer, Matthew Thompson, worked for Denise for several years. Denise had a sexual relationship with him for years, while she was his supervisor; before they eventually got married. While Denise was still married to Matthew Thompson, she had numerous extra-marital affairs with persons whom she supervised at Loyola University Campus Police. Just about everyone in the Campus Police Department knew about Denise Thompson's promiscuity. Denise was caught on CCTV camera performing fellatio on Major Earl Egan (A Caucasian male), in the locker room where the Campus Police uniforms are stored. The reason that she was caught on CCTV camera, was because Jocelyn Kelly secretly planted a camera in the locker room. Timothy Fox kept a copy of the CCTV camera footage of Denise Thompson having sexual relations with then Earl Egan on a disc. Timothy Fox showed the footage to numerous people. He kept the copy of the footage in his desk. According to Rufus Dawson, Timothy Fox showed the camera footage of Denise Thompson and Earl Egan to Joan Flynn. Joan Flynn was telling people

that she saw the footage and "It was good to the last drop." Earl Egan was allowed to retire from Loyola University Maryland after 25 years of service. Denise Thompson also had a long going affair with Officer, Melvin Somma (A Caucasian male), who was recently terminated in November 2021, after being written up and suspended numerous times throughout his tenure at Loyola University Maryland (which spanned for over 15 years). In 2018, Denise Thompson's husband (who was employed as a dispatcher at Loyola University at the time), confronted Melvin Somma on the parking lot of 5104 York Rd. (Loyola University Campus Police Building). The two men were about to fight. Neither, Matt Thompson, Melvin Somma, or Denise Thompson were suspended or terminated from Loyola University Maryland for their domestic situation and outbursts. And, ironically Denise Thompson is still employed with Loyola University Maryland as a Lieutenant on the 8am x 4:00pm shift.

90. Also, Jocelyn Kelly (A Caucasian female) is still employed with Loyola University Maryland. Jocelyn Kelly has received numerous disciplinary actions while she has been employed with Loyola University Maryland. Jocelyn has also been suspended numerous times by Human Resources for her inappropriate behavior, planting a hidden camera in a locker room/changing room and for tampering with and changing employees' records and files by breaking into employees email accounts etc. But, despite all of the disciplinary actions that Jocelyn Kelly has received while at Loyola University, she was still promoted to An Associate Director. Jocelyn Kelly is still employed with Loyola University Maryland.

91. Another comparison, deals with Joan Flynn (A Caucasian female) and her ex-husband or lived-in boyfriend, Joseph Bradley (Caucasian Male, Director of Planning and Events). Joan Flynn (Associate Vice President), is another employee in Upper Management at Loyola University, who has been known to have sexual relationships with several men at Loyola University.  When Joan was married to her first husband, she had an affair with Joseph Bradley, who was also married at the time.  During the affair, Joseph Bradley was not a Director.  He was a Supervisor in Event Services.  Joan and Joseph both left their marriages and moved in together.  According to Timothy Fox and Robert Maglia, Joan and Joseph Bradley secretly got married but failed tell everyone in upper management.

92. **May 2018**, a parent and a Loyola University student made a complaint against Joseph Bradley.  The student, along with his sister came into the Investigative office and filed an assault report against Joseph Bradley.  According to the student, he worked part-time for Joseph Bradley in Event Services.  Joseph Bradley offered the student and several other students a job (to be paid under the table) to work for him at a downtown concert that was being held at the Baltimore Arena.  The student reported that he agreed to work; but the day of the event, he could not make it to work.  The student said, he tried to contact Joseph Bradley via his cell phone but he got no response.  The following Monday, which was a couple of days before graduation, the student was working for Event Services.  Joseph Bradley approached him, grabbed him by his neck and choked him.  Then Joseph Bradley proceeded to slam him against a wall in front of other students.  Due to the fact that the student already suffered from PTSD, the student was afraid to go back to work at Event Services.  The student's mother wanted something

done about the assault. Robert Maglia wrote the incident report. When the student and his sister left the Investigators' office, Robert Maglia immediately took the report over to then Director Timothy Fox. Robert Maglia never conducted an investigation per Timothy Fox. Nothing was ever done with the case. Robert Maglia and Timothy Fox never followed protocol by forwarding the information to Human Resources. In January 2019, the same student and his mother again filed a complaint with Robert Maglia and Adrian Black, about nothing being done to Joseph Bradley, after he assaulted a student. Again, Joseph Bradley suffered no consequences for his actions. Joseph Bradley is still the Director of Planning and Events and Joan Flynn was promoted to Associate Vice President, External Affairs and Emergency Management. The Plaintiff can name numerous Campus Police Officers who were suspended, placed on probation and/or given verbal and written reprimands.

93. For example, Officer Hugh Carter (A Caucasian male) was constantly stayed in trouble at Loyola University Maryland. He was reported by a female. African-American student for profiling, discrimination and an assault. Officer Carter was written up. An employee reported Officer Carter for Harassment. Officer Carter was given a verbal reprimand. Finally, Officer Carter was reportedly having an affair with a Loyola University Student in 2019. Officer Carter was suspended for a week. Then three weeks later, Officer Carter was fired from his position. The Plaintiff has knowledge about the above mentioned incidents because the Plaintiff investigated many of the complaints against Officer Hugh Carter.

94. The Plaintiff can go on and on listing names of Loyola University Campus Police Officers who were given oral and written reprimands, suspended for a period of time, and even placed on an Employee Performance Improvement Plan (PIP). Another example for instance, was Campus Police Officer Adam Burgan (A Caucasian Male) who had been written up numerous times, suspended and placed on an (PIP). Adam was later promoted to Campus Police Officer II and paid a lump sum of back pay for the time that he was not a Police Officer II. Adam Burgan was later criminally charged by Baltimore County Police with Child Pornography and committing a crime against juveniles. He is currently serving his sentence in jail.

95. Loyola University Maryland is notorious for the unjust and unequitable treatment of people of color; particularly in the Campus Police Department. Many Campus Police Officers have filed law-suites against Loyola University Maryland. For example, Andrea' Bass (An African American female) who has filed an EECO complaint against Loyola University Maryland in 2018 because of her unfair treatment from Timothy Fox and others while she was employed at Loyola. Andrea' Bass' complaint was sustained by the Federal EEOC and she received monetary compensation for her damages.

96. Another former Loyola University Campus Police Officer, Arthur Cheeks (An African American Male) who slipped on ice while on duty and dislocated his shoulder was terminated by Timothy Fox while he was still under his doctor's care; and working lite duty because of his injuries. Arthur Cheeks also filed an EEOC Lawsuit against Loyola University Maryland using the Law Offices of Kathleen Cahill LLC. Arthur Cheeks won his claim and was compensated for all damages. It was also determined through the EEOC

investigation that Loyola University Maryland has discriminated against and unjustly terminated and punished the African Americans and People of Color for many years.  As a condition of the law-suite, brought against Loyola University Maryland, it was determined that anyone person of color who was unjustly treated and/or terminated by Loyola University Maryland, had up to three years from the date of termination to file a complainant and/or law-suite against the university.

The Plaintiff mentioned all the above information only to show that the punitive process at Loyola University is an unfair and unjust process.  Since the Plaintiff was assigned the position of Investigator in 2013, Tim Fox, along with some of his colleagues and friends in higher Management, and also along with Robert Maglia, Jocelyn Kelly, Denise Thompson, and Joan Flynn, all worked to create or perpetuate a toxic environment for the Plaintiff in an effort to hinder her advancement with Loyola University Maryland; and to eventually terminate the Plaintiff from her position as Investigator.  Joan Flynn and Adrian Black made sure their mission to seek vengeance against the Plaintiff for her filing an EEOC Complaint against Loyola University Maryland and to avenge the forced retirement of Timothy Fox; was carried out to completion.  The Plaintiff was terminated without just cause or due process.  The Plaintiff was never given a written or verbal reprimand.  Nor was the Plaintiff ever suspended or placed on a PIP, unlike many other Loyola University employees.  The Plaintiff was terminated without given due diligence. The Plaintiff returned to the U.S Equal Employment Opportunity Commission (EEOC) and filed an additional complaint which launched a full investigation.  EEOC granted the Plaintiff a Notice of a Right to File Suit against Loyola University Maryland.  But, due to

117

the Courts closure as a result of COVID-19, and due to the fact that the Plaintiff lose several family members in 2020 and 2021 to COVIC-19 death, the did not possess the mental capacity or space to file the Civil Lawsuit in a more timely fashion.  The Plaintiff prays that the Court will consider Equitable Tolling based upon the aforementioned and based upon the fact that the Plaintiff received disparity and inequality in treatment for many years while she was employed with Loyola University Maryland.

## RELIEF

WHEREFORE, the Plaintiff respectfully request and pray that this Honorable Court:

1.   Award the Plaintiff two years of back pay since she was unemployed for almost a year before she secured employment with another company.  Also, the Plaintiff had to take a twenty thousand dollar cut in pay when she did get hired by the company. And, when the Plaintiff was unemployed, she was unable to collect Unemployment benefits due to the fact that Elaine Kudsieh (HR manager/Loyola University) and an hired attorney who represented Loyola University and testified at the Plaintiff's Unemployment Hearing to ensure that the Plaintiff did not receive any of her unemployment benefits.  The Plaintiff's unemployment benefits were denied.

2.  Have Loyola University Maryland reimbursed the Plaintiff all the funds to include the taxes that were paid on the funds, that she had to liquidate from her 401K Retirement Plan in order to maintain and take care of her bills (rent, gas and electric, food, telephone bills, car payment, car insurance etc.), herself and her son during the time that she was unemployed.

118

3. That Loyola University Maryland pay the Plaintiff or designated University the funds to send her son to college since, Loyola guarantees 100% College Tuition Grants for employee's children, which are granted to employees who has been employed with Loyola University Maryland for three years or more.  The Plaintiff was employed with Loyola for almost seven years.  And, the Plaintiff's son started college in 2020.  The Plaintiff son attends St. John's University.  The Plaintiff currently pays her son's college tuition.

4. That the Defendant, Loyola University Maryland be made to pay pain and suffering and any other punitive damages for placing the Plaintiff under tremendous stress by giving the Plaintiff an increased and workload. And, the Plaintiff was constantly harassed and placed in a hostile work environment which caused the Plaintiff an enormous amount of stress.  The Plaintiff was constantly worried because management and direct supervisors at Loyola University Maryland were continuously plotting to have her terminated.  The stress resulted in the Plaintiff developing high blood pressure and becoming a diabetic.   The Plaintiff continues to take medication for her medical conditions.

5. The Defendant pay any and all Attorney Fees.

6. The Defendant pay all Court Costs.

7. That the Court will grant the Plaintiff such other and further relief as the nature of her cause may require.

In closing, the Plaintiff, Delsie E. Parker, hereby certify and acknowledge that the preceding statements are true to the best of her recollection.

Respectfully submitted,

Delsie E. Parker  12/06/2021
Delsie E. Parker